862 So.2d 595 (2003)
Ex parte MONSANTO COMPANY and Solutia, Inc.
(In re Sabrina Abernathy et al.
v.
Monsanto Company et al.)
1011393.
Supreme Court of Alabama.
February 26, 2003.
As Modified on Denial of Rehearing May 9, 2003.
*598 Warren B. Lightfoot, Jere F. White, Jr., Harlan I. Prater IV, Adam K. Peck, and *599 William S. Cox of Lightfoot, Franklin & White, L.L.C., Birmingham; George P. Ford of Ford & Howard, P.C., Gadsden; and W. Stancil Starnes of Starnes & Atchison, L.L.P., Birmingham, for petitioners.
Donald W. Stewart, Anniston, for respondents.
William H. Pryor, Jr., atty. gen., and R. Craig Kneisel and William D. Little, asst. attys. gen.; Joseph D. Hubbard, district atty., Calhoun County, Anniston; Robert E. Owens, district atty., Shelby County, Columbiana; W. Van Davis, district atty., St. Clair County, Pell City; and Steve Giddens, district atty., Talladega County, Talladega, for the State.
Olivia H. Jenkins, gen. counsel, and James L. Wright, Alabama Department of Environmental Management.
SEE, Justice.
This petition for the writ of mandamus is the third mandamus petition to arise out of a toxic-tort case pending against Monsanto Company, Pharmacia Corporation,[1] and Solutia, Inc.[2] (hereinafter referred to collectively as "Monsanto"), in the Etowah Circuit Court. Monsanto asks this Court to direct the trial judge, Joel Laird, to recuse himself from this case because, it argues, Judge Laird's conduct and public remarks about Monsanto would lead a reasonable person to question whether Judge Laird was biased against Monsanto or lacked impartiality. Monsanto argues that Judge Laird's comments and actions both in and out of the courtroom demonstrate an appearance of bias against Monsanto. Monsanto is particularly concerned about comments Judge Laird made in connection with a March 12, 2002, settlement conference and in what Monsanto terms "ex parte newspaper and television interviews." This Court denies Monsanto's petition.
Monsanto manufactured and disposed of polychlorinated biphenyls ("PCBs") in Anniston, Alabama, from 1935 to 1971. A portion of the Toxic Substances Control Act of 1976, 15 U.S.C. § 2605(e), bans the manufacture and distribution of PCBs in the United States.
In March 1996, Thomas Long, Sr., sued Monsanto, alleging that Monsanto had released PCBs and other harmful chemicals into the air, soil, surface water, and groundwater near his property in Calhoun County. Long further alleged that he suffered physical and other damage as a result of the release of those harmful chemicals. Two additional actions were filed against Monsanto alleging negligence, wantonness, breach of a duty to warn, fraud, misrepresentation, deceit, nuisance, trespass, the tort of outrage, common-law strict liability, assault, battery, and negligent and intentional infliction of emotional distress in the release of those chemicals. The trial court consolidated the three actions; there are currently over 3,500 plaintiffs in the consolidated action. This case is not a class action.
The trial court originally scheduled the trial to begin on March 15, 1999. On March 1, 1999, Monsanto petitioned this Court for a writ of mandamus, claiming that the trial could not possibly begin because the trial court had not ruled on approximately 30 pending motions. On March 8, 1999, this Court stayed the proceedings and ordered answer and briefs. On March 23, 2001, this Court denied Monsanto's mandamus petition. Ex parte Monsanto Co., 794 So.2d 350 *600 (Ala.2001) ("Monsanto I"). This Court noted:
"It would have been an abuse of discretion for the trial court to proceed to trial on these toxic-tort cases without a case-management order to govern the disposition of the cases. However, the passage of time and the intervening actions of the trial court taken at our direction have resolved many of the issues raised in Monsanto's petition."
794 So.2d at 352. This Court instructed the trial court to rule on Monsanto's change-of-venue motion in a timely manner and to issue a case-management order. 794 So.2d at 358.
The trial court ordered a change of venue and moved the trial from Calhoun County to Etowah County. On January 7, 2002, a jury trial began on claims common to all the plaintiffs and on the property-damage claims of 17 plaintiffs.[3] None of those 17 plaintiffs presented personal-injury claims other than claims seeking damages for mental anguish. On February 22, 2002, a jury returned a verdict in favor of the plaintiffs and found Monsanto liable on the plaintiffs' claims of wantonness, the tort of outrage, suppression of the truth, negligence, trespass, nuisance, and public nuisance.
On February 25, 2002, Judge Laird ordered the parties to be present in his courtroom on March 2, 2002, for a settlement conference.[4] On Tuesday, February 26, 2002, Monsanto moved the trial court to postpone the March 2 settlement conference. Judge Laird denied the motion. On Wednesday, February 27, 2002, in a telephone conversation, Monsanto's attorney again asked Judge Laird to postpone the March 2 conference. Judge Laird responded that he would reschedule the conference if Monsanto gave him written assurance that everyone he had ordered to be present at the conference would be present at a rescheduled conference on an alternative date.
On February 28, 2002, Monsanto's attorneys faxed Judge Laird a letter, stating that they had informed everyone involved with the case that the settlement conference would not take place on March 2, *601 2002, and that Monsanto would provide Judge Laird with an alternative date. At 5:50 p.m. on March 1, 2002, Monsanto's attorneys faxed Judge Laird another letter, stating that eight of the nine people Judge Laird had ordered to be present at the settlement conference would be available for a settlement conference on March 12.
On March 2, 2002, Judge Laird went on the record in his courtroom to state that Monsanto was not present for the conference that had been scheduled for that day. In court on March 5, 2002, in a dialogue with attorneys for the parties present, Judge Laird stated on the record:
"And I understand it's not easy to get these nine folks in one room at one time... That's why I was certainly agreeable to rescheduling that conference, but I did want a little more assurance than I had, but now that I have that assurance, I am pleased that they will be here ... And I certainly hope that we can get some things accomplished that day."
On the morning of March 12, 2002, the parties met in Judge Laird's courtroom for the settlement conference. At some point during the conference, Monsanto petitioned this Court for a writ of mandamus ordering the trial court not to compel Monsanto's chief executive officer, its chief financial officer, and its general counsel to testify during the March 12, 2002, settlement conference. Around 12:40 p.m., Monsanto stated that it would no longer participate in the settlement conference because Judge Laird had threatened the chairman of Solutia, Inc., with contempt sanctions for failing to participate in the settlement negotiations in good faith.[5] Judge Laird then withdrew the threat of contempt sanctions, but Monsanto stated that it would no longer participate in settlement efforts. At 12:44 p.m. the trial court went on the record and called Solutia's chairman, John Hunter, to testify. During the course of Hunter's testimony, Monsanto's attorney, Jere White, stated on the record:
"I did not come here today prepared to reach a resolution of cleanup with [the Alabama Department of Environmental Management], the attorney general's office, the district attorney's office, or any other governmental agency. I have never had a substantive conversation with representatives from any of those groups."
Judge Laird responded:
"That's not my fault. That's why I asked you to be here today, Mr. White, because I knew that on your own you would not have those conversations."
At 1:10 p.m.[6] Monsanto moved this Court for "an immediate order staying all proceedings before the trial court in this case, including the `settlement conference' currently underway." This Court did not stay all proceedings, but on March 12, 2002, this Court did stay the settlement conference and any other proceedings being conducted by the trial court pursuant to Rule 16, Ala. R. Civ. P. At approximately 2:00 p.m., as the trial court prepared to recess for an hour, Monsanto's attorney, on the record in open court, "advise[d] the [trial] Court that we have been notified that the Supreme Court has issued a stay of all proceedings [in the case] *602 which would include Mr. Branchfield testifying." (Transcript at 6677.)[7]
At that point, the trial court already had adjourned the settlement conference. Based on the representation made by Monsanto's attorney as to the scope of the stay issued by this Court, Judge Laird suspended all other proceedings in the trial as well. This Court subsequently dismissed Monsanto's mandamus petition as moot because the settlement conference had been adjourned. Judge Laird resumed proceedings in the case later in the day on March 12 when he learned that this Court had stayed only the settlement conference and any other proceedings being conducted pursuant to Rule 16, Ala. R. Civ. P.[8]
*603 After the jury had submitted its liability verdict on February 22, 2002, it was presented evidence of the individual property-damage claims. In the next phase of the trial, the jury will hear evidence concerning personal-injury claims. The trial court has not entered a final judgment on any claims. The trial court has permitted several governmental entities to intervene as plaintiffs, including the State of Alabama and the Alabama Department of Environmental Management ("ADEM"). The trial court ordered, sua sponte, that the City of Anniston be added as a plaintiff with respect to claims for injunctive relief.
On March 29, 2002, Monsanto moved for Judge Laird to recuse himself from this case. Monsanto argued in its recusal motion:
"[B]ased upon the Court's remarks and conduct toward Defendants thus far in this case, culminating in the events that occurred during a settlement conference conducted by the Court on March 12, 2002 there exists a clear basis on which a reasonable person might question the existence of bias or lack of impartiality by the Court."
Monsanto also argued in its recusal motion that "statements by the court in media interviews about this case require recusal." On April 1, 2002, Monsanto moved for Judge Laird to stay all further proceedings pending a ruling on the recusal motion. Judge Laird stayed the proceedings in part, permitting continued introduction of evidence to the jury, but deferred ruling on pending motions. On April 17, 2002, before the trial court ruled on the recusal motion, Monsanto petitioned this Court for a writ of mandamus ordering Judge Laird to recuse himself. On May 23, 2002, this Court ordered Judge Laird to rule on the recusal motion within 21 days. On June 10, 2002, Judge Laird transferred the recusal motion to Judge William Cardwell of Etowah County. On August 8, 2002, Judge Cardwell conducted a hearing on Monsanto's recusal motion. On November 8, 2002, Judge Cardwell denied Monsanto's recusal motion. Judge Cardwell's order stated:
"The Court finds that the statements and discussions complained of that occurred during the course of the trial [do] not demonstrate prejudice or bias that would require a recusal. Judge Laird's response to this aspect is well-taken.
". . . .
"Reviewing Judge Laird's statements to the media, those statements do not warrant the Judge's disqualification, although *604 this court feels it would have been better if the Judge had refrained from talking with [the media].
"It appears that Judge Laird was, in his way, explaining the procedures and conduct of the trial after a finding of liability and public nuisance by a jury. This certainly paints the parties in a different light than at the commencement of trial. It is clear that Judge Laird's communications were to clarify, and set the format for a resolution of the case through a settlement. The statements do not go so far as to show that the Judge's mind was closed or that he exhibited an unwillingness to rule fairly."
On November 18, 2002, Monsanto filed with this Court notice of Judge Cardwell's ruling, and Monsanto reiterated its request for mandamus relief directing Judge Laird to recuse himself.
"`A mandamus petition is the proper method to review the trial court's denial of a motion to recuse.'" Ex parte City of Dothan Personnel Bd., 831 So.2d 1, 5 (Ala.2002)(quoting Ex parte Cotton, 638 So.2d 870, 872 (Ala.1994)).[9]
"A writ of mandamus is an extraordinary remedy, and it `will be issued only when there is: 1) a clear legal right in the petitioner to the order sought; 2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; 3) the lack of another adequate remedy; and 4) properly invoked jurisdiction of the court.'"
Ex parte Butts, 775 So.2d 173, 176 (Ala.2000)(quoting Ex parte United Serv. Stations, Inc., 628 So.2d 501, 503 (Ala. 1993)).
"`Under Canon 3(C)(1), Alabama Canons of Judicial Ethics, recusal is required when "facts are shown which make it reasonable for members of the *605 public or a party, or counsel opposed to question the impartiality of the judge." Specifically, the Canon 3(C) test is: "Would a person of ordinary prudence in the judge's position knowing all the facts known to the judge find that there is a reasonable basis for questioning the judge's impartiality?" The question is not whether the judge was impartial in fact, but whether another person, knowing all the circumstances, might reasonably question the judge's impartiality whether there is an appearance of impropriety.'"
City of Dothan Personnel Bd., 831 So.2d at 5-6 (quoting Ex parte Duncan, 638 So.2d 1332, 1334 (Ala.1994) (citations omitted)).[10]
"`"`[T]he law will not suppose a possibility of bias or favor in a judge who is already sworn to administer impartial justice and whose authority greatly depends upon that presumption and idea.'" Any disqualifying prejudice or bias as to a party must be of a personal nature and must stem from an extrajudicial source.'"
Ex parte Little, 837 So.2d 822, 825 (Ala.2002)(quoting Ex parte Melof, 553 So.2d 554, 557 (Ala.1989)).[11] "`The burden of proof is on the party seeking recusal.'" City of Dothan Personnel Bd., 831 So.2d at 9 (quoting Ex parte Cotton, 638 So.2d at 872). "[A] mere accusation of bias that is unsupported by substantial fact does not require the disqualification of a judge." *606 Ex parte Melof, 553 So.2d at 557 (emphasis omitted).[12] Further, "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion.... Almost invariably, they are proper grounds for appeal, not for recusal." Liteky v. United States, 510 U.S. 540, 555, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994).
Monsanto argues that its request for "recusal is not based upon an isolated adverse ruling or a stray remark ... but from the trial court's consistent course of conduct." In its petition, Monsanto alleges that Judge Laird has demonstrated an appearance of bias in two ways: (1) in comments made in orders and in courtroom exchanges throughout the course of the proceedings, particularly during the March 12, 2002, settlement conference, and (2) in comments made during interviews with television and newspaper journalists.[13]

March 12, 2002, Settlement Conference
Analysis of Monsanto's allegations is fact-intensive. Monsanto argues that Judge Laird demonstrated bias by threatening to jail Monsanto executives for contempt for their alleged failure to negotiate in good faith at the March 12, 2002, settlement conference, and that Judge Laird demonstrated bias by threatening to compel Monsanto executives to give testimony at the settlement conference. The plaintiffs argue that Monsanto is "wrong on the facts and the law."
Monsanto argues that Judge Laird demonstrated his bias during the discussions about what was to happen at the March 12 settlement conference. In its petition, Monsanto quotes a dialogue between Judge Laird and one of its attorneys that took place before the March 12 settlement conference in which the attorney stated to the court that Monsanto did not want the corporate officers who were coming to the settlement conference to be compelled to testify:
"The Court: They are here for a settlement conference. But there may be facts of which they can testify to in this case too.
"Mr. White: That is why I'm asking. I wouldn't think a settlement conference would be something where somebody would testify. But you might just ask them questions, is what you're saying?
"The Court: Yeah. But then they also may be pertinent witnesses for the injunctive *607 relief in this case. So they may be here for dual purposes.
"Mr. White: Welland that'swe're are not calling themWe have other people who know a lot more about this, like Mr. Branchfield, and we are getting them here for purposes of the settlement, not to be witnesses.
"The Court: But they are alsoMr. Branchfield doesn't know what the chief financial officer of these corporations knows as to the financial conditions of these corporations. And that may be pertinent evidence, necessary evidence on the injunctive phase of this case.
"Mr. White: Here is my concern. I'm just sort of laying it out there because I'm troubled about it. As I said, I worked hard on bringing people down here for the purposes of settlement. And then I don't want them to get down here and find out that they are here for settlement, and not only that, they are going to have to testify. I wouldI think it is appropriate to keep them separate and apart. And let's get through this. And then if Your Honor thinks somewhere later you might need testimony from somebody, then we will revisit it at that time. Is that okay?
"The Court: That's fine. I was going to keep it separate. The settlement conference will be separate from any testimony in this case.
"Mr. White: And again, I didn't want a situation where we might conclude the settlement conference and you say I now want to put somebody on the stand to testify. Because they are comingYour Honor has the inherent power under Rule 16 [Ala. R. Civ. P.] to bring someone down here for a settlement conference. And that is why they are coming.
"The Court: And I think I have the inherent power under the rules of evidence to call witnesses.
"Mr. White: I really wish we wouldn't do that, Judge. That is going to put me in a difficult situation. Because, I mean, they are coming down here for the purposes of settlement. And I would really ask, you know, so we could keep it on that basis, and that is what your order was.
"The Court: As long as they are coming here to negotiate in good faith a settlement in this case, I don't have a problem keeping this strictly to settlement. And I don't want anybody to leave the settlement conference until this case is settled. The settlement conference could take several days. And I won't call any witnesses. I won't call them as a witness. They may be informed that they will have to come back as witnesses."
(Petition at 12-14, quoting transcript at 5897; emphasis in petition.) Monsanto also quotes Judge Laird as saying later in the same dialogue:
"I want to do it in my courtroom in Anniston with my bailiff there in case I find somebody is not negotiating in good faith, they will be close to my jail instead of the Jefferson County jail."[14]
(Petition at 15, quoting transcript at 5898.)
Monsanto argues that the quoted passages indicate that Judge Laird contemplated contempt sanctions at least a week before the settlement conference even though, it argues, Judge Laird lacked any justification to threaten contempt sanctions before the settlement conference actually took place.
*608 Monsanto argues that Judge Laird continued to demonstrate bias by his conduct at the settlement conference.[15] Monsanto argues that Judge Laird's actions in connection with the settlement conference lacked any basis in law or fact, and that Judge Laird's actions were an improper attempt to coerce a settlement. Monsanto cites Kothe v. Smith, 771 F.2d 667, 669 (2d Cir.1985), as persuasive authority for the proposition that Rule 16, Ala. R. Civ. P., "does not sanction efforts by trial judges to effect settlements through coercion."[16]
Monsanto argues that Judge Laird's conduct after he adjourned the settlement conference on March 12, 2002, also demonstrates his bias against Monsanto. At 12:40 p.m. on March 12, after adjourning the conference, Judge Laird called John Hunter, the chairman and chief executive officer of Solutia, to the witness stand. Monsanto argues, without directly quoting any supporting examples from the transcript, that Judge Laird asked "inappropriate" questions of Hunter and that the act of making Hunter testify in and of itself constitutes evidence of bias on Judge Laird's part. Monsanto argues that Judge Laird further demonstrated bias at the conference when he stated to Monsanto's lawyers, "I don't want [a settlement offer] to go through you because I'm not confident and I'm not sure you're communicating everything you should to your client." (Petition at 21, quoting transcript at 6649.) Monsanto asserts that Judge Laird further demonstrated bias when he later stated:
"It's obvious to this Court thatI mean, this Court has heard testimony since the second week of January, and it's obvious to this Court that the same attitude that Solutia or Monsanto exhibited years ago still exists today, and that is a lack of concern for the environment, a lack of concern for their neighbors and the plaintiffs in this case, and it's obvious to this Court that it is simply the Defendant's strategy and plan to keep from facing the music in this case as long as they possibly can and stretch it out as long as they possibly can."
(Petition at 21, quoting transcript at 6629.) Monsanto also argues that the remarks Judge Laird made while adjourning the settlement conference demonstrate bias[17] and that Judge Laird's remarks later that evening directed to one of Monsanto's attorneys demonstrate bias.[18] Without citation *609 to authority, Monsanto concludes that "[t]he court's actions at the March 12 settlement conference and immediately thereafter exceeded all bounds of authority and evidence the existence of bias and lack of impartiality sufficient to require recusal." (Petition at 26.)
The plaintiffs argue that Monsanto is wrong on the facts and the law. The facts before this Court indicate that Judge Laird sanctioned no one for contempt and forced no one to settle. When Monsanto indicated that it was unwilling to settle the action, Judge Laird adjourned the settlement conference. Judge Laird never agreed before the settlement conference not to call any executives as witnesses; instead, Judge Laird agreed only that he would not call executives as witness "[a]s long as they are coming here to negotiate in good faith ...."
Although Monsanto argues that Rule 16, Ala. R. Civ. P., does not permit Judge Laird to coerce a settlement and that Judge Laird's threats to hold Monsanto executives in contempt constitute coercion, the scope of Judge Laird's Rule 16 authority is not at issue in a motion to recuse based on the judge's alleged bias. "`[R]ulings on issues of law or attitudes concerning legal issues' do not establish bias or prejudice requiring recusal unless those rulings or attitudes are the product of bias and prejudice of an extra-judicial source." In re Sheffield, 465 So.2d 350, 357 (Ala.1984). If Judge Laird's threats to sanction Monsanto for contempt exceeded his authority under Rule 16, Ala. R. Civ. P.,[19] Monsanto's remedy would lie in an appeal of Judge Laird's ruling, not in an action seeking his recusal. The remarks Judge Laird directed at Monsanto's attorneys do not indicate that Judge Laird should recuse himself for bias because Judge Laird's remarks apparently are based on what he learned during the course of the trial. "An appearance of partiality cannot necessarily be presumed to follow from a stormy relationship with the attorneys for a party." Barnett v. City of Chicago, 952 F.Supp. 1265, 1269 (N.D.Ill.1997). Judge Laird suggested in his remarks that his judgments were formed by what he had seen during the course of the litigation.[20]
*610 "The judge who presides at a trial may, upon completion of the evidence, be exceedingly ill disposed towards the defendant, who has been shown to be a thoroughly reprehensible person. But the judge is not thereby recusable for bias or prejudice, since his knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings, and are indeed sometimes ... necessary to completion of the judge's task."
Liteky, 510 U.S. at 550-51, 114 S.Ct. 1147. We hold that Judge Laird's conduct and remarks in conjunction with the March 12 settlement conference do not constitute grounds for his recusal.

Judge Laird's Judicial Conduct and Remarks
Monsanto also argues that Judge Laird's comments during portions of the trial provide evidence that he appears to be biased and constitute grounds for his recusal. To support its argument, Monsanto cites 12 examples of what it considers to be biased judicial remarks by Judge Laird before the March 12, 2002, settlement conference. The plaintiffs respond that those isolated statements do not prove that Judge Laird appears biased and that Judge Laird's conclusions regarding Monsanto are justified based on the facts of the case;[21] therefore, they argue, those statements and conclusions do not warrant his recusal.
Monsanto argues, for example, that Judge Laird's "Trial Management and Scheduling Order," entered on June 7, 2001, contained "gratuitous and unfounded criticism of Defendants' credibility, which bore no relation to trial management or scheduling, [and] was inappropriate as it apparently was made solely because Defendants sought mandamus relief, as is their right, from this Court with respect to numerous pending pretrial motions." (Petition at 37.) Monsanto quotes from Judge Laird's order:
"First, allow this Court to point out that Defendants, through counsel, have been less than completely honest and straightforward with not only this Court, but the Supreme Court of Alabama."
(Petition at 36, quoting from "Trial Management and Scheduling Order.")
Judge Laird, however, continued in a portion of the order not quoted by Monsanto:
"Defendants would have one believe, and in fact tried to convince the Supreme Court of Alabama, that this Court has failed to provide the parties in this case with any guidance, direction, plan or management order whatsoever concerning the trial of this case. The same could not be further from the truth.

*611 This Court attaches hereto as Exhibit `A' a detailed `Pre-trial Scheduling Order' which was entered on May 13, 1998, setting this case for trial November 16, 1998, and setting strict, but realistic time lines within which to prepare this case for trial. All parties, however, while moving forward, ignored deadlines set by this Court and this Court continued the trial until February 1, 1999, and again to March 15, 1999.
"It should be noted that all parties announced ready when this Court attempted to select a jury on February 1, 1999.
". . . .
"Other than creating a huge obstruction for the Plaintiffs in this case, this Court cannot understand why Monsanto would logically object to the above-mentioned trial plan. If the jury finds in favor of Monsanto after the liability phase, the case is over. By trying each Plaintiff's causation and damages issue separately, this Court has essentially granted Defendant's Motion to sever these Plaintiffs and try each Plaintiff's case separately, another issue in Monsanto's Petition for Writ of Mandamus. The only difference is that only one (1) jury will hear the cases rather than three thousand five hundred thirty-one (3,531) juries, which will substantially reduce the costs, not only for all parties concerned, but the State and its taxpayers as well."
(Trial Management and Scheduling Order entered June 7, 2001; emphasis in original.)
Monsanto also argues that in the trial court's order changing venue of the case to Etowah County, Judge Laird "raised allegations of possible racism against the Defendants...." (Petition at 37.) Monsanto quotes from Judge Laird's change-of-venue order:
"This Court finds that the `potential' biases that may exist in the three (3) counties proposed by the Defendants to be much more troubling and certainly hopes that Defendants aren't attempting to inject issues of race into this case."
(Petition at 37.) Monsanto takes this quotation from the portion of the order in which Judge Laird explains the rationale for his venue order. Judge Laird stated:
"Taking all of the factors into consideration, this Court finds that Etowah County is the most suitable county of the contiguous counties in which to try this case. It is most similar in both population, size and diversity. It is convenient for all parties and witnesses and maintains the only Courthouse that could adequately facilitate this trial.
"Therefore, this Court will now compare Etowah County and the Defendants' concerns to the counties of Blount, DeKalb, and Marshall. Defendants clearly state in their Motion that all of their concerns raise only `potential' biases. This Court finds these `potential' biases to be remote at best. This Court certainly finds the `potential' biases that may exist in the three (3) counties proposed by the Defendants to be much more troubling and certainly hopes that Defendants aren't attempting to inject issues of race in this case.
"A survey of the 2000 census data from the U.S. Census Bureau reveals that Calhoun County has a population of 112,249, 78.9% of which is Caucasian and 18.5% of which is African-American. Etowah County has a population of 103,459, 82.9% of which is Caucasian and 14.7% of which is African-American. Blount County has a population of 51,024, 95.1% of which is Caucasian and 1.2% of which is African-American. DeKalb County has a population of 64,452, 92.6% of which is Caucasian and 1.7% of *612 which is African-American. Marshall County has a population of 82,231, 93.4% of which is Caucasian and 1.5% of which is African-American.
". . . .
"Therefore, upon consideration of all concerns expressed by the parties, the law and Code of Alabama, the requirements of the Constitution, and in the interest of justice and the convenience of the parties and witnesses, this Court finds that Etowah County is the nearest county free from proper objection by any party."
(Change-of-venue order entered June 7, 2001; emphasis in original.)
Monsanto also argues that Judge Laird has made statements on the record in court that provide a basis for questioning his impartiality. From the more than 6,000 pages of transcript generated thus far in this trial, Monsanto cites 10 instances in which it alleges Judge Laird appeared biased.[22] Monsanto argues that on January 22, 2002, Judge Laird appeared biased when he stated:
"The Court: ... I don't think it's going to confuse the jury, but I do think that there is a real possibility and probability that this jury is going to think that these plaintiffs ought to be afraid. I think they ought to be afraid. I would be afraid, and I haven't had my blood tested and don't plan to, but I can tell you if I had elevated levels in my blood, and I think I'm a fairly reasonable person, if I had elevated levels in my blood, I [would] be afraid because I don't know what might happen. It would cause me concern. It would cause me to stay awake at night, and I think it would do the same for you. I think you're a fairly reasonable person, too, Harlan [Prater, defense attorney]."
(Petition at 38-39, quoting transcript at 1620-21.) In the next paragraph of the transcript, Judge Laird discusses the exhibit:
"But I do have a concern about this exhibit that Mr. [Harlan] Prater has handed me about the conclusions because I have done a lot of reading, too. I haven't read everything I feel like I need to read and I haven't read everything I feel like I'm going to wind up reading before this case is ultimately over, but I do have a problem jumping from probable causes to causes."
(Transcript at 1621.) The complete record is not before this Court, but from the limited context available from the excerpts provided to this Court by Monsanto in the exhibits offered in support of its petition, one can infer that Judge Laird, in the second paragraph recited above, states that he agrees with defense attorney Harlan Prater that one of the plaintiffs' exhibits has a problem. Because the trial transcript is excerpted, the transcript page incorporated as an exhibit in Monsanto's petition does not identify who is speaking in the passage immediately preceding Judge Laird's comments, but that page of the transcript reads:
"The potential is very real that it will confuse the issue and that that jury will sit there and say, `Wow, those people ought to be afraid because PCBs cause cancer, PCBs cause these other things.' And these people don't know that."
(Transcript at 1620.) The transcript excerpt attributes the statement immediately *613 following Judge Laird's remarks to Mr. Stewart, the lead plaintiff's attorney. Mr. Stewart states:
"Judge, I think what he is doing is he's going to the studies that have been done by other people and he's reviewed those, and he's linking PCB exposure and levels to those diseases...."
(Transcript at 1621.) In this exchange, Judge Laird appears merely to describe how he believed a reasonable person would process the facts at issue in an exhibit.
Monsanto argues that on January 28, 2002, Judge Laird exhibited bias when he stated:
"The Court: Well, a person's home is his castle, right.
"Mr. Prater: Yes, sir.
"The Court: I wonder what the king would think if his property was contaminated. I really wonder what the president of Monsanto would think if his property was contaminated and it was worth less thanit had a negative value, was going to cost twice as much to clean it up as it was worth, and his wife didn't want to leave that castle. What do you think the king would do when the queen didn't want to leave?"
(Petition at 39-40, quoting transcript at 2930-31.) That exchange took place as part of a discussion about the kind and amount of damages that would be permitted by law in this case. The discussion immediately preceding the quoted passage offers some context:
"[unnamed party]: I understand what they are talking about the property law, before and after, what the value of the property is before and after. And there is a law under nuisance that says they are supposed to be made whole under those circumstances, and that certainly was created.
"The other damage I was saying to the Court that is existing there is what is happening to these people as a result of the continuing problems on this particular site.
"The Court: Well, certainly
"Mr. Stewart: It is in the air breathe [sic]
"The Court: There again, if you are looking at it ifIf the jury comes back with an awardsay the difference between before and after fair market value is $50,000, and they come back and give a plaintiff $50,000, but yet it costs $100,000 to clean it up, then the plaintiff still can't clean it up. And there is still a continuous
"Mr. Prater: Perhaps, Your Honor, that plaintiff[s], may have to elect their remedy; although, I still think the law is clear in Alabama that they are not entitled in a property-damage case to get more than the value of the property before and after. That law is 200 years old in this state.
"Mr. Stewart: Of course, that law doesn't contemplate what happened in this instance Judge."
At this point the portion quoted by Monsanto begins:
"The Court: Well, a person's home is his castle, right.
"Mr. Prater: Yes, sir.
"The Court: I wonder what the king would think if his property was contaminated. I really wonder what the president of Monsanto would think if his property was contaminated and it was worth less thanit had a negative value, was going to cost twice as much to clean it up as it was worth, and his wife didn't want to leave that castle. What do you think the king would do when the queen didn't want to leave?"
*614 And this exchange with Peck and Prater, Monsanto's attorneys, followed immediately:
"Mr. Prater: One of those things we are going to persuade you, Your Honor.
"Mr. Peck: Your Honor, aside from the legal point that
"The Court: I'm ready to go.
"Mr. Peck: Okay. There is also a foundational problem.
"The Court: I'm past ready to go.
"Mr. Peck: Okay. Got it.
"Adjourned at 4:45 p.m."
(Transcript at 2928-31.)
Monsanto argues that Judge Laird displayed bias when he accused Solutia of posting something on its Web site in violation of a pretrial order that prohibited the parties from discussing the case with the press. Monsanto quotes that accusation and the colloquy that followed:
"The Court: ... I guess, since Solutia has settled the Owens case, it feels like that that's all it needed to do for the community.
"Mr White [defense counsel]: I don't believe that's correct, Your Honor, and I'm hopeful that Your Honor isn't viewing these statements from various sources that way.
"The Court: This is not a `various source.' This is the associate general counsel, assistant general counsel, for Solutia.
"Mr. White: Yes, sir. The evidence in this case, Your Honor, has shown efforts are ongoing in Anniston as we speak.
"The Court: For remediation, but we are looking at
"Mr White: And I will make sure, Your Honor, that those are taken off the Web site.
"The Court: Well, I don't really care if this one stays on there. Like I said, I think it's interesting where they at one time want to settle disputes because they believe it's good for the community, but now, rather than trying to avoid litigation expense, it looks like they're trying to increase litigation expense."
(Petition at 40-41, quoting transcript at 3736-37.) The portions of the transcript immediately preceding and following the discussion cited by Monsanto indicate that Judge Laird was discussing his concerns about the inability of the parties to settle this case. In the transcript, he states (first quoting from the Solutia Web site):
"[The court]: ... `as expert fees, travel expenses and other items associated with preparing their case for trial. Certainly, this agreement contains no finding of wrongdoing or finding that Solutia is or would be liable to plaintiffs. Monsanto and Solutia have acted in a forthright and diligent manner in addressing PCBs found in the environment in Anniston. The companies have successfully invested over $40 million on extensive projects at and near the Anniston plant to manage and control PCBs associated with the plant's manufacturing operations. Solutia will continue to work cooperatively with the U.S. Environmental Protection Agency and Alabama Department of Environmental Management and other governmental agencies to determine what actions are necessary and appropriate to deal with future remedial needs.'"
At this point the material quoted by Monsanto begins:
"The Court: ... I guess, since Solutia has settled the Owens case, it feels like that that's all it needed to do for the community.
"Mr White [defense counsel]: I don't believe that's correct, Your Honor, and I'm hopeful that Your Honor isn't viewing *615 these statements from various sources that way.
"The Court: This is not a `various source.' This is the associate general counsel, assistant general counsel, for Solutia.
"Mr. White: Yes, sir. The evidence in this case, Your Honor, has shown efforts are ongoing in Anniston as we speak.
"The Court: For remediation, but we are looking at
"Mr White: And I will make sure, Your Honor, that those are taken off the Web site.
"The Court: Well, I don't really care if this one stays on there. Like I said, I think it's interesting where they at one time want to settle disputes because they believe it's good for the community, but now, rather than trying to avoid litigation expense, it looks like they're trying to increase litigation expense."
The discussion continued immediately after the portion quoted by Monsanto:
"Mr. White: Your Honor, we have been participating in settlement negotiations in this case with Your Honor, and while they have not gone like
"The Court: And I think the settlement offers on both sides have been utterly ridiculous.
"Mr. White: Yes, sir.
"The Court: On both sides.
"Mr. White: Yes, sir.
"The Court: That means your side, too.
"Mr. White: I understand.
"The Court: In fact, they have been I'm trying to think of a real good phrase for it. Ridiculous isWell, they're insulting. More than just ridiculous, the offers that I know of have been insulting and ridiculous.
"Mr. White: Yes, sir.
"The Court: Ridiculous on both sides, but certainly insulting on one side, certainly compared to settlements that have been made in other cases with fewer plaintiffs."
(Transcript at 3736-38.)
Monsanto cites Judge Laird's comments on February 11, 2002, as an instance of bias:
"Mr. Prater: ... I just want to make sure I don't make you any angrier than I have to at any stage in these proceedings, Your Honor.
"The Court: I'm not sure you've had to make me as angry as I am yet, but y'all have chosen to do that, and I don't know that it's your choice. I do believe it's the folks in St. Louis that made this decision, and that's fine, but yeah, I want to know each day what has been done and I want to know each day what is going to be done and when and where."
(Petition at 41-42, quoting transcript at 4206.) The transcript excerpt incorporated as an exhibit to Monsanto's petition contains one additional paragraph that Monsanto does not quote:
"[Mr. Prater]: ... We are continuing to work with Mr. Stewart in scheduling different activities. We're looking forward to receiving his status report in response to what we submitted last week."
(Transcript at 4206.)
Monsanto also cites Judge Laird's remarks during a discussion about discovery issues as further evidence of his bias:
"The Court: Y'all have other forms of discovery as well.
"Mr. Prater: Well, Mr. Stewart was just complaining about the other forms of discovery, Your Honor, I mean, we're trying to get this as efficiently as we *616 possibly can in accordance with Your Honor's wishes.
"The Court: Me, too.
"Mr. Prater: Absolutely. Do you think we want to depose people unnecessarily?
"The Court: Yes.
"Mr. Prater: No, sir, we don't. No, sir, we don't.
"The Court: Y'all have not given me any indication that you want to do anything else in this case unnecessarily. There is so much in this case that has been unnecessary that I just don't believe, no, that you don't want to take these depositions unnecessarily. I think you want to take every one of them twice, for nothing else, just to harass the plaintiffs
"Mr. Prater: That isn't true.
"The Court:and make it as unbearable as possible for them as you have for everybody else.
"Mr. Prater: Your Honor, as an officer of the Court, I respectfully say that is not our purpose.
"The Court: Well it certainly appears to be when I read pages after pages of irrelevant questions."
(Petition at 42-43, quoting transcript at 4212-14.)
The discussion immediately surrounding the exchange Monsanto quotes indicates that the plaintiffs had complained that Monsanto was engaging in unnecessary discovery. The passage that immediately precedes the foregoing quoted material states:
"[Plaintiffs' attorney]: ... twice, and they're having them again. Now some of those are on the personal-injury claims, but some of them are not. Some of them are on these plaintiffs that are fresh and new, and a lot of the informationThere may be a word changed or two words changed or something like that, so what we're doing is we're spending a lot of time going back over the same ground that we've gone over again."
(Transcript at 4212.) The material quoted by Monsanto in its petition appears at this point:
"The Court: Y'all have other forms of discovery as well.
"Mr. Prater: Well, Mr. Stewart was just complaining about the other forms of discovery, Your Honor, I mean, we're trying to get this as efficiently as we possibly can in accordance with Your Honor's wishes.
"The Court: Me, too.
"Mr. Prater: Absolutely. Do you think we want to depose people unnecessarily?
"The Court: Yes.
"Mr. Prater: No, sir, we don't. No, sir, we don't.
"The Court: Y'all have not given me any indication that you want to do anything else in this case unnecessarily. There is so much in this case that has been unnecessary that I just don't believe, no, that you don't want to take these depositions unnecessarily. I think you want to take every one of them twice, for nothing else, just to harass the plaintiffs
"Mr. Prater: That isn't true.
"The Court:and make it as unbearable as possible for them as you have for everybody else.
"Mr. Prater: Your Honor, as an officer of the Court, I respectfully say that is not our purpose.
"The Court: Well it certainly appears to be when I read pages after pages of irrelevant questions."
The material immediately following the quoted portion reads:
"Mr. Prater: And we will talk, Your Honor, to our lawyers who are taking those depositions about that very thing.

*617 "Mr. [Jere] White: And we didn't have any problems in preparation for the trial of these 16. We didn't have any problem with that, and if it got into an area that Donald or who else was there covering, they said, `I think this was adequately covered,' then, as a rule, they discussed it, worked it out and moved on.
"Mr. Stewart [plaintiff's counsel]: That may be true with you, Jere, but that's not necessarily true...."
(Transcript at 4214.)
Monsanto argues that, on February 12, 2002, Judge Laird took an adversarial position in response to an objection it raised about a witness's ability to testify as to a document, and that the judge's stance made it appear as if Monsanto were trying to mislead the jury. In support of that claim, Monsanto quotes from the transcript:
"The Court: What is the basis of the objection?
"Mr. Ford [defense counsel]: The witness is not familiar with this document. He can't identify the document. It was generated before he was ever at Monsanto.
"The Court: Okay. Tell me who was at Monsanto at the time that could come here and testify as to the authenticity of this document.
"Mr. Ford: I don't know, Your Honor, but if the plaintiffs wish to introduce the document, it's the plaintiff's job to get the person to come here and identify it.
"The Court: Okay. I'll tell you what. Have the president of Monsanto get on a plane today and be here tomorrow morning at 9:00. We can go ahead and recess until then.

"Mr. Prater [defense counsel]: Your Honor, perhaps I can help.
"The Court: Well, I hope somebody can.
"Mr. Prater: Yes sir. I am going to try. We have agreed with the plaintiffs about the authenticity of documents. I don't think that's anything we are questioning right now at all, Your Honor. I know Mr. Ford has a lot more experience than I do, but I think the basis of his objection was that Mr. Rainsaw himself had not seen this particular document and yet he was being cross-examined about it.
"The Court: I wanted him to be here so we can solve this situation. Who from Monsanto can come here and testify?
"Mr. Ford: Your Honor, I'll just withdraw the objection.
"The Court: Well, I want to know out of curiosity.
"Mr. Prater: I don't know if there is anybody that can identify anything from 1958, Your Honor, in all candor, and we withdraw the objection. I apologize if we have agitated the Court. That's certainly not what we had hoped to do or attempted to do."
(Petition at 43-45, quoting transcript at 4483-85; emphasis in petition.)
The material immediately preceding and following this exchange adds context. The material immediately preceding is as follows:
"Q [plaintiffs' counsel]: And this document is from 1958; is that correct?
"A [witness]: Yes, it is.
"Q: And this shows that they were measuring Niran and PNP at really sub part per million levels in the parts per billion; isn't that right?
"A: Well, I see parts per million here. I don't see anything that says parts per billion.
"Q: If you look on under the Niran, it's.3 parts per million. That would be 300 parts per billion wouldn't it?
"A: Yes.

*618 "Mr. Fell: Judge, at this time I would move for the admission of Plaintiffs' Exhibit into evidence.
"Mr. Ford: Same objection. Your Honor."
At this point, the portion of the exchange quoted by Monsanto begins:
"The Court: What is the basis of the objection?
"Mr. Ford [defense counsel]: The witness is not familiar with this document. He can't identify the document. It was generated before he was ever at Monsanto.
"The Court: Okay. Tell me who was at Monsanto at the time that could come here and testify as to the authenticity of this document.
"Mr. Ford: I don't know, Your Honor, but if the plaintiffs wish to introduce the document, it's the plaintiff's job to get the person to come here and identify it.
"The Court: Okay. I'll tell you what. Have the president of Monsanto get on a plane today and be here tomorrow morning at 9:00. We can go ahead and recess until then.
"Mr. Prater [defense counsel]: Your Honor, perhaps I can help.
"The Court: Well, I hope somebody can.
"Mr. Prater: Yes sir. I am going to try. We have agreed with the plaintiffs about the authenticity of documents. I don't think that's anything we are questioning right now at all, Your Honor. I know Mr. Ford has a lot more experience than I do, but I think the basis of his objection was that Mr. Rainsaw himself had not seen this particular document and yet he was being cross-examined about it.
"The Court: I wanted him to be here so we can solve this situation. Who from Monsanto can come here and testify?
"Mr. Ford: Your Honor, I'll just withdraw the objection.
"The Court: Well, I want to know out of curiosity.
"Mr. Prater: I don't know if there is anybody that can identify anything from 1958, Your Honor, in all candor, and we withdraw the objection. I apologize if we have agitated the Court. That's certainly not what we had hoped or attempted to do."
And following that, the exchange continued:
"The Court: Well, y'all brought it up. I was trying to solve the question.
"Mr. Prater: Yes sir. I understand that."
(Transcript at 4483-85.)
Monsanto argues that Judge Laird exhibited bias during a discussion on February 18, 2002, on Monsanto's motion for a judgment as a matter of law. Monsanto quotes from the transcript:
"Mr. Prater: With all due respect, Your Honor, I think a reasonable inference can be made in the ongoing process with the [United States Environmental Protection Agency] that [cleaning up the plaintiffs' properties] is exactly what is being looked at.
"The Court: I think certainly this jury can make more of a reasonable inference that Monsanto plans to do nothing with these people's properties.
"Mr. Prater: Well, I'm glad you are not on the jury, Your Honor.
"The Court: Well, you better be glad I'm not on the jury.
"Mr. Prater: Yes, sir.
"The Court: Because I see no evidence in this case of Monsanto's desire to do anything for these plaintiffs. And I've seen nothing outside the evidence to show this Court that Monsanto desires to do anything for these plaintiffs. So *619 all I have seen is that Monsanto will run down to Oxford to clean up the mall to zero or nondetect and clean up a ball field to nondetect but nothing else. And I just wonder how Monsanto can do that so quickly after it's discovered and not be willing to go [sic] more in this case."
(Petition at 45-46, quoting transcript at 5271-72; second alteration in petition.) Monsanto quotes from 8 pages later in the transcript of February 18:
"The Court: They [defendants] are just hoping they can get out of this case on a technicality.
"Mr. Stewart: That is what I think they are doing.
"The Court: This is obvious as to what they are doing."
(Petition at 46, quoting transcript at 5280; alteration in petition.)[23]
Monsanto cites as another example of bias a discussion on February 25, 2002, about jury instructions. Monsanto recites from the transcript:
"The Court: ... That's all I'm asking; tell me whether or not the evidence in this case supports the fact that it is a public nuisance.
"Mr. White: But, Judge, how can they make that decision if they don't know about the others?
"The Court: Let me ask you: How can they not make that decision, considering the fact that it [PCBs] is in everyIt is in the waterways; it is in the air; it is in Oxford; it is in Talladega County. It is limited more than these 16 folks. So how can they not really reach the conclusion? That is my question. I don't see how they could not reach that conclusion."
(Petition at 47, quoting from transcript at 5608.)[24] The discussion immediately preceding the material quoted by Monsanto reads:
"Mr. White: If certain conditions are met, you are correct.
"The Court: And I think we can answer those questions when we get to that part of asking them what the damages are.
"Mr. King: Judge, in addition if the Court is inclined to doIt sounds like you are inclined to ask that one question. We do think it needs to be put in context so that they can understand the difference between public and private.
"We had requested some charges before that we would request the Court to give, including 6.2, 6.3 I think now should ask if you determine that the conduct alleged by the plaintiffs would be a private nuisance, it has limited effects to only a few individuals, then you may not find a public nuisance exists. I think the Court has said you are not going to give that charge, but I think that would be an appropriate charge.
"I would especially ask for a modification of 6.5 to say this, because I don't think this is covered in what the Court has highlighted. `To be a public nuisance you must find that the conduct caused a special damage as to these plaintiffs, special damage[ ], damage which is different in kind and degree from the damage suffered by the public in general.' And that comes from the Russell case.

*620 "The Court: Not necessarily, because in this portion of the case, we aren't dealing with just these 16 people and their damage. I think when we get to the point of charging the jury on damages, we will have to ask them if these plaintiffs suffered any special damage that weren't suffered at large. But at this point, for the sake of determining whether this is a public or private nuisanceor whether it is a public nuisance...."
(Transcript at 5605-08.) This is the point where the material quoted by Monsanto begins:
"The Court: ... That's all I'm asking; tell me whether or not the evidence in this case supports the fact that it is a public nuisance.
"Mr. White: But, Judge, how can they make that decision if they don't know about the others?
"The Court: Let me ask you: How can they not make that decision, considering the fact that it [PCBs] is in everyIt is in the waterways; it is in the air; it is in Oxford; it is in Talladega County. It is limited more than these 16 folks. So how can they not really reach the conclusion? That is my question. I don't see how they could not reach that conclusion."
(Transcript at 5605-08.)
Monsanto also cites comments made by Judge Laird on February 25, 2002, that appear 32 pages later in the transcript, at a point when the parties were discussing what would come next in the trial:
"The Court: Well, I just thought about what else it was I wanted to say. Back in the record I have you saying that Judge, you know how these things work; we go for a little while in the courtroom and we hear the evidence, and then both sides start talking, and we will start talking and maybe settle this case.
"I also have the attorneys for the defendant in this case on the record, and I think even on the record before the Supreme Court of this state, stating that what the defense wanted was a benchmark trial then to determine what to do in the rest of this case.
"The only thing I see the defense doing in this case is try[ing] to run to Montgomery and stretch this thing out as far as possible. So I don't believe that the defense was arguing [in] good faith with the Supreme Court of this state. I don't believe the defense has been arguing to this Court in good faith. I don't believe the defense has been dealing with this Court in good faith, certainly has not been dealing in good faith in any mediations this Court has ordered.
"I certainly don't believe the defense has been dealing in good faith and trying to reach the most efficient and effective resolution of this case.
"So what else was it, Mr. Prater?
"Mr. Prater: I regret, Your Honor, that you feel that way.
"The Court: I regret that I do too.
"Mr. Prater: We take very seriously our obligations to this Court and other courts. I think in no way, Your Honor, have we shirked that responsibility in any way whatsoever.
"The Court: I just tend to disagree."
(Petition at 47-49, quoting transcript at 5639-42.) The material surrounding this exchange puts those remarks in context:
"[unknown speaker]: ... The plaintiffs, though, with respect to these 16 plaintiffs have rested. Therefore, the evidence that pertains to these 16 plaintiffs has already been presented to this jury, and we think it would be appropriate at this time for that portion of the case to be
*621 "The Court: Again, the plaintiffs rested as to phase one in this case.
"I tried my best to make it as clear as possible as long as three plus years ago that it was this Court's intent and plan to proceed with a phase one, with phase one solely being the determination of liability in this case.
"Now, the parties did convince me that in order to prove liability in this case, that some evidence would have to be presented as far as damages goes and that a certain number of plaintiffs would have to be allowed to testify in this first phase. That made sense to this Court. So the Court agreed. But this Court has never changed its plan of proceeding with phase one being liability and then damages being considered after phase one. I'm going to stick to that plan until somebody higher than me tells me I should go with a different plan.
"And certainly this Court will abide by any directives it is given. But what else, Mr. Prater?
"Mr. Prater: Yes sir. I understand your ruling on my previous two motions, Your Honor.
"In light of Your Honor's scheduling order that was entered in November of 2001, November 20, 2001"
(Transcript at 5637-39.) At this point the portion of the exchange quoted by Monsanto begins:
"The Court: Well, I just thought about what else it was I wanted to say. Back in the record I have you saying that Judge, you know how these things work; we go for a little while in the courtroom and we hear the evidence, and then both sides start talking, and we will start talking and maybe settle this case.
"I also have the attorneys for the defendant in this case on the record, and I think even on the record before the Supreme Court of this state, stating that what the defense wanted was a benchmark trial then to determine what to do in the rest of this case.
"The only thing I see the defense doing in this case is try[ing] to run to Montgomery and stretch this thing out as far as possible. So I don't believe that the defense was arguing [in] good faith with the Supreme Court of this state. I don't believe the defense has been arguing to this Court in good faith. I don't believe the defense has been dealing with this Court in good faith, certainly has not been dealing in good faith in any mediations this Court has ordered.
"I certainly don't believe the defense has been dealing in good faith and trying to reach the most efficient and effective resolution of this case.
"So what else was it, Mr. Prater?
"Mr. Prater: I regret, Your Honor, that you feel that way.
"The Court: I regret that I do too.
"Mr. Prater: We take very seriously our obligations to this Court and other courts. I think in no way, Your Honor, have we shirked that responsibility in any way whatsoever.
"The Court: I just tend to disagree."
And this follows immediately after the portion quoted by Monsanto:
"Mr. Prater: Yes, sir. As to other motions we would like to make at this time, in light of Your Honor's November 22, 2001, scheduling order, which required the plaintiffs to identify more than 75 days those plaintiffs that would be designated for subsequent phases, we move to dismiss all plaintiffs that were designated for the phase two portion of this trial because they were not designated more than 75 days before their case is to be presented. We ask for Your Honor *622 to enforce that aspect of your scheduling order.
"The Court: Again, simplyand I believe I have already stated this for the record days ago. But this Court didn't draft that order. I'm not sure which party drafted the order. I know the defendants requested a certain number of days to be given notice as to which order the plaintiffs would be called. And this Court deems that to simply be a notice, period, as to notice of which plaintiffs are being called in which order, not, as I have said beforeThat 75 days was not a date within which the parties could begin getting this case ready for trial.
"I will note again on the record that over three years ago when this case was called up for trial in February that both sides announced ready to proceed. And at that time this case had over 2,000 plaintiffs in it at that time, around 2,700 I believe.
"So both sides have announced ready to proceed at that time. Both sides announced ready to proceedWell, no. One side asked for a continuance. But this Court cut discovery off in this case as of September 2001.
"The order that you are referring to that requires the plaintiffs to give 75 days notice. Does thatbut that order also says...."
(Transcript at 5637-44.) At that point the transcript excerpt submitted with Monsanto's exhibits cuts off.
Monsanto submits a final example of what it argues are prejudicial remarks by Judge Laird from the transcript of proceedings on Saturday morning, March 2, 2002. The portion of the transcript quoted by Monsanto reads:
"The Court: ... [T]his is a public case. Monsanto has chosen to litigate this case in a public forum. [It has] failed to act in good faith in the past to mediate the case, so I don't know that there's a problem in disclosing to the public that a settlement conference may be going on, but we will just say we're starting testimony next Wednesday on the injunctive phase."
(Petition at 49, quoting transcript at 5810.) Monsanto included two pages from the transcript of the March 2, 2002, proceedings among its exhibits. The other included material reads:
"The Court: Let's go on the record, Rusty. Let the record reflect that today I had set a settlement conference for 9:00. It is about 9:25. I've got two clocks that sayWell, I've got three clocks that say 9:27, so it must be 9:27. Present in the court are the district attorney, Joe Hubbard, on behalf of the State of Alabama, John Buchanan, my bailiff; Rusty Houk, my court reporter; and me.
"I did receive a letter yesterday. First of all, it's on the record on Tuesday where the defense made a motion to delay or postpone this hearing today. I denied the motion. Since that day, the parties were here in this courtroom in Anniston on Wednesday. I believe Wednesday afternoon I received a phone call from Jere White, one of the attorneys for the defendants. Mr. White...."
(Transcript at 5801.) There is a gap in the materials Monsanto submitted as exhibits; the transcript picks up nine pages later at page 5810. Nothing on the page in the materials Monsanto submitted to this Court indicates who is speaking at this point. Because Monsanto quotes Judge Laird from this page, we assume that Judge Laird is speaking at this point as well:

*623 "... testimony, if not sooner. That way we will avoid whatever problem Mr. White [Monsanto's attorney] had about calling this a `settlement conference.' Certainly, that's not admissible before the jury, any talks of settlement negotiations, and it wouldn't be admissible before the jury, so I'm not sureI know he doesn't want the news media knowing that the parties in this case are talking settlement, but I think the news media has a right to know under the Constitution."
At this point the material quoted by Monsanto begins:
"[T]his is a public case. Monsanto has chosen to litigate this case in a public forum. [It has] failed to act in good faith in the past to mediate the case, so I don't know that there's a problem in disclosing to the public that a settlement conference may be going on, but we will just say we're starting testimony next Wednesday on the injunctive phase."
(Transcript at 5801 and 5810.)
Without citation to authority, Monsanto concludes that those remarks individually or collectively indicate that Judge Laird has improperly taken on the role of advocate and that, therefore, the Alabama Canons of Judicial Ethics require his recusal.
Monsanto included among its exhibits some transcript excerpts from which it did not quote in its petition. An excerpt from February 25, 2002, reads:
"The Court: If I truly believed that the defendants would be prejudiced by proceeding, I wouldn't proceed. But I simply don't believe in looking at the information in Defendants' Bench Exhibit 11 that the defense says they need, and given the time within which the defense has had to obtain this information, the fact that they didn't even obtain it years ago when they had an opportunity to obtain it, then when they should have obtained itwhen this case was set for trial previouslygiven so many factors that I have already enumerated on the record, looking at the state of the testimony in this casemy goodness; Mr. Bliss, I simply don't understand how he is going to come in and say anything different than he did before. He has already found there is no market resistance.
"Mr. Prater [defense counsel]: Then I guess the plaintiffs won't need to take his deposition, Your Honor.
"The Court: I'm not going to let them. I'm not going to let them. Because his opinion is not going to change. You think he is going to come in here and testify on behalf of Monsanto thatmarket resistance?
"Mr. Prater: He is going to testify as the facts develop, Your Honor, and he is going to testify truthfully.
"The Court: Okay. Well, then, I don't think the plaintiffs are worried about the truth if that is what the truth is going to be.
"What I am saying is if his testimony is different, it just about had to [inure] to the benefit of the plaintiffs. If it is not any different, well, then, we don't need to waste the time of this Court and of Mr. Bliss and of a whole lot more folks in even
"Mr. Prater: And, Your Honor, we have discussed since Friday among ourselves, and we would be happy to discuss with Your Honor and Mr. Stewart [plaintiff's counsel] ways that the subsequent parts of this case can be streamlined.
"And it was our hope, Your Honor, and perhaps an incorrect expectation that perhaps we could sit down with Your Honor and Mr. Stewart after the phase that was completed on Friday to talk about ways to streamline the case *624 through stipulations or other mechanisms.
"The Court: Okay. My ears are open. Start talking.
"Mr. Prater: We will need to discuss it further, Your Honor, and would be happy to talk with Your Honor.
"The Court: I told you my ears are open. I'm listening.
"Mr. Prater: Yes sir. There may be stipulations that can be applied to some of the testimony. Of course, stipulations go two ways, Your Honor, and we have to have the plaintiffs' cooperation with that. We will be happy to talk with them about it. "The Court: This Court sees no reason why a lot of the remainder of the testimony in this case cannot be stipulated.
"Mr. Prater: Your Honor, that may be correct, and we merely askand I know that is exactly what Your Honor doesn't want to hear, but ask for some time to try and figure out ways to do that and make it manageable for everyone.
"The Court: Y'all have had plenty of timeWe have been in this trial since January
"Mr. Prater: I knew you wouldn't like it Judge. I knew you wouldn't like it.
"The Court: I like the idea. It is just too little too late. We have been here a long time already. We have got a very long time to go. I'm not going to waste any more time than I have to to reach a result that may not happen. I've spent these past seven weeks doing as the defense basically requested me to do three years ago with the belief that the defense was going to act in good faith in using this as a benchmark or in trying to settle this case once the testimony began.
"ButAnd again, I don't think it is the fault of any of the attorneys from Lightfoot, Franklin, & White [law firm]. I certainly don't think it is the fault of the Honorable George Ford. I think that directive came from St. Louis. And I think your hands have been tied. But I've got to proceed toward the finish line in this case. I have spent a great deal of time giving the parties time and the attorneys time to try to come up with ways to shorten this case or ways to resolve the issues in this case without going through this lengthy process. And I haven't gone forward on any of those efforts. If anything, I have gone backwards. I don't want to spend any more time to stay in the same spot or to go backwards. I'm moving toward the finish line in this case as best I can.
"So y'allBut just because I'm not going to call a recess for y'all to discuss ways doesn't mean y'all can't continue to discuss ways.
"Mr. Stewart: Judge, might I suggest that we do that and make some suggestions to the Court as to how we could shorten some aspects of the trial of this case? For instance, if they are willing to stipulate to some of the findingsIt is my understanding they don't intend to take any soil samples. That is what one of the parties told me, they are not going to take any soil samples on any of the remaining properties."
(Transcript at 5701-08.) Monsanto cuts off the excerpt at this point.
When Monsanto's counsel suggested to the trial court that in order to speed up the proceedings Monsanto would need a recess to discuss stipulations with the plaintiffs, Judge Laird refused to grant a recess. Instead, Judge Laird "vented" his frustration about the delays in the case. Judge Laird invited Monsanto to make suggestions about stipulations in open court; Monsanto demurred. The fact that Judge Laird saw this request for a recess *625 as an attempt by a party to delay the proceedings and that he expressed his frustration with any delay does not indicate that Judge Laird appears biased.
The plaintiffs argue that "[a]ll of the allegedly prejudicial statements were made by the trial judge directly in the course of judicial proceedings and constituted the judge's assessment of the defendants' conduct during the litigation." (Plaintiffs' Answer at 17.) We agree. The evidence presented in Monsanto's petition does not suggest that Judge Laird exhibited any bias before the commencement of this action or from any source outside the proceedings.
It is unrealistic to expect a trial judge not to form opinions during the course of litigation, and the expression of those opinions is not grounds for a judge's recusal. Liteky, 510 U.S. at 550-51, 114 S.Ct. 1147.
"As Judge Jerome Frank pithily put it: `Impartiality is not gullibility. Disinterestedness does not mean child-like innocence. If the judge did not form judgments of the actors in those court-house dramas called trials, he could never render decisions."
Liteky, 510 U.S. at 551, 114 S.Ct. 1147. Moreover, a trial judge's expression of annoyance at counsel is the expected result of the judge's attempt to enforce courtroom discipline and is expressly not a ground for recusal. See Ex parte Large, 501 So.2d 1208, 1210 (Ala.1986)(holding that a trial judge's characterization of the counsel/defendant's actions as unconscionable is not grounds for recusal); Hartman v. Board of Trustees of Univ. of Alabama, 436 So.2d 837, 841 (Ala.1983)(holding that a trial judge's expression of anger over the plaintiff's filing of a mandamus petition with this Court was not grounds for recusal); Liteky, 510 U.S. at 556, 114 S.Ct. 1147 ("A judge's ordinary efforts at courtroom administrationeven a stern and short-tempered judge's ordinary efforts at courtroom administrationremain immune."). We hold that Monsanto has not demonstrated a clear legal right to Judge Laird's recusal based on Judge Laird's judicial remarks and actions.

Press Accounts of the Trial
Monsanto argues finally that Judge Laird's statements concerning this case in ex parte print and broadcast media interviews require his recusal because, it argues, those statements create the impression that Judge Laird is biased. In support of this claim, Monsanto has submitted as exhibits photocopies of 27 print or Internet newspaper articles[25] and videotapes of what Monsanto represents to be television news stories during which Judge Laird was interviewed about this case. In its petition, Monsanto quotes directly from several articles and television news stories and argues that the quoted material demonstrates that Judge Laird appears to be biased.
Monsanto's supporting exhibits are properly before this Court because they are part of the record below.[26]See Rule 21(a), Ala. R.App. P. ("The petition shall contain ... copies of any order or opinion or parts of the record that would be essential *626 to an understanding of the matters set forth in the petition."). See also Ex parte Singleton, 475 So.2d 186, 188 (Ala.1985) ("`On review by mandamus, we must look at only those facts before the [court below].'" (quoting Ex parte Baker, 459 So.2d 873, 876 (Ala.1984))). This does not, however, end our analysis of the media exhibits; we must also consider the reliability and the weight of the exhibits to determine whether they constitute sufficient evidence that Judge Laird has demonstrated the appearance of bias.
Rule 902(6), Ala. R. Evid., treats newspaper articles as "self-authenticating" for the purpose of admitting them into evidence; that is, the Alabama Rules of Evidence do not require "extrinsic evidence of authenticity as a condition precedent" to admitting a newspaper article into evidence.[27] Rule 902, Ala. R. Evid. The Advisory Committee's Notes to Rule 902 explain that newspaper articles are self-authenticating because "the likelihood of forgery of such materials is slight." The Advisory Committee's Notes caution, however:
"Accepting such materials as authentic, under this paragraph, does not necessarily answer other evidentiary concerns, such as materiality, relevancy, hearsay, etc. Likewise, accepting the authenticity of a newspaper or periodical does not resolve issues of authority and responsibility for items contained therein."
The plaintiffs argue that Monsanto's exhibits provide unreliable evidence in support of the proposition that Judge Laird appears biased. The State of Alabama and ADEM argue that "[t]he print comment, reported in the St. Louis Post-Dispatch on March 15, may be summarily dismissed as hearsay." (State and ADEM's Brief at 18.) The State and ADEM also argue that the Wall Street Journal article "is an example of hearsay piled upon hearsay ..."[28] (State and ADEM's Brief at 19.) ADEM argued before Judge Cardwell that it had "never heard [of] a judge's action being described as being biased merely based on the impressions of a reporter ... [Judge Laird] ought to be judged based on the hard evidence, not on hearsay and not on a reporter's impressions." (Transcript of the recusal hearing at 125-26.)
All of the media exhibits Monsanto submitted in support of its petition are likely hearsay.[29]See Persons v. Summers *627 274 Ala. 673, 678, 151 So.2d 210, 212 (1963)("The court also erred in permitting a newspaper article which described the judicial actions of appellant into evidence. The article was hearsay and objection to its introduction should have been sustained."); Dallas County v. Commercial Union Assurance Co., 286 F.2d 388, 391-92 (5th Cir.1961)("Of course a newspaper article is hearsay, and in almost all circumstances is inadmissible." (footnote omitted)); Metropolitan Council of NAACP Branches v. FCC, 46 F.3d 1154, 1165 (D.C.Cir.1995)("We seriously question whether a New York Times article is admissible evidence of the truthfulness of its contents."). Moreover, even were the newspaper articles admissible into evidence under a hearsay exception, this Court still would have to consider the weight of the admitted hearsay evidence in support of any conclusion. Because the newspaper articles are hearsay, they presumptively do not themselves provide sufficiently reliable evidence to support our granting Monsanto's petition for a writ of mandamus ordering Judge Laird to recuse himself.
"An affidavit in support of a motion to disqualify a judge is generally insufficient when it is supported merely by hearsay.... [That does not mean] that an affidavit in support of a motion to disqualify a judge can never rely upon hearsay. However, an affidavit which relies upon hearsay must have some indicia of reliability."
In re Farman, 841 P.2d 99, 102 (Wyo. 1992). In this case the Court has no reliable means of knowing whether the quotations attributed to Judge Laird in the newspaper articles accurately reflect his words or whether newspaper interviews attributed to Judge Laird actually even took place. We lack sufficient indicia of reliability to take from the newspaper articles anything more than the fact that the articles speak about Judge Laird.
While on their face, videotapes of television news interviews would appear to possess greater indicia of reliability than do newspaper accountsbecause the viewer can see Judge Laird speaking in the videosthis Court can reasonably conclude from viewing the videotapes only that Judge Laird spoke with television reporters. The television news packages are edited accounts of Judge Laird's remarks; because the edited segments may not present Judge Laird's remarks in their proper context, those television accounts are not a sufficiently reliable basis for concluding what specific statements Judge Laird may have made.[30] Moreover, Monsanto did not submit the original broadcast tapes from the television stations as an exhibit with its petition; Monsanto, instead, submitted as an exhibit copies of unknown provenance that purport to be television news stories broadcast on specific dates.[31] Because the television accounts are videotapes made, *628 and conceivably even edited, from the edited remarks originally broadcast by the television stations, they present a reliability problem and a hearsay problem as to any specific remarks that Judge Laird may have made.
In United States v. Microsoft Corp., 253 F.3d 34 (D.C.Cir.2001), the United States Court of Appeals for the District of Columbia Circuit considered this very issue. Microsoft introduced newspaper accounts as exhibits in support of its argument on appeal that the trial judge was biased and should be required to recuse himself. The United States Court of Appeals for the District of Columbia Circuit held that it would "assume the truth of the press accounts and not send the case back for an evidentiary hearing on the subject. [It, however, would] reach no judgment on whether the details of the interviews were accurately recounted." 253 F.3d at 108. The District of Columbia Circuit Court of Appeals took this approach because it found "in [its] analysis of the arguments presented by the parties, the specifics of particular conversations are less important than their cumulative effect." 253 F.3d at 109. Further, in Microsoft, the plaintiffs admitted to the truth of what the trial judge had said in the published interviews and the plaintiffs chose not to defend any of the trial judge's public remarks. See 253 F.3d at 108. This Court follows the approach taken by the District of Columbia Circuit Court of Appeals in Microsoft. This Court declines to find that any of the articles submitted as exhibits accurately recount the specifics of what Judge Laird may have said in any interview, and this Court will consider only whether Judge Laird's conduct in responding to a series of media inquiries about this case indicates that Judge Laird has exhibited bias in a manner that justifies recusal. The videotape exhibits, we conclude, indicate that Judge Laird spoke with television reporters about this case.
In Microsoft, the District of Columbia Circuit Court of Appeals' ultimate decision that the trial judge must recuse himself was based not on "what the District Judge said, but to whom he said it and when." 253 F.3d at 115.[32] The Microsoft court held:
"Rather than manifesting neutrality and impartiality, the reports of the interviews with the District Judge convey the impression of a judge posturing for posterity, trying to please reporters with colorful analogies and observations bound to wind up in the stories they write."
253 F.3d at 115. In Microsoft, the trial judge had conducted secret interviews with members of the press intended for publication at the conclusion of the trial. The Microsoft court found that the appearance that the trial judge coveted favorable publicity and perhaps a place in history created the appearance of bias. 253 F.3d at 115. Conversely, Judge Laird's actions in this case, answering a few questions posed by local reporters in a high-profile case, do not create the appearance of a judge coveting publicity or seeking a place in history. The press accounts, considered in their totality, are quite benign. We hold, therefore, that Monsanto has not demonstrated a clear legal right to have Judge Laird recuse himself based on comments attributed to Judge Laird in press accounts of the trial.
Monsanto argues, however, that this Court should consider the substance *629 of the remarks attributed to Judge Laird in press accounts of the trial as evidence indicating that Judge Laird appears biased because, it argues, the substance of the remarks attributed to Judge Laird by the press demonstrate an appearance of bias. In its petition, Monsanto quotes from four television news stories and one newspaper article to demonstrate its contention that Judge Laird appears biased.
Monsanto quotes Judge Laird from a purported March 13, 2002, WBRC-TV news broadcast, as saying: "When you have a jury that's already found one party liable in a case, well, that ought to give that party incentive to try to settle." (Petition at 28.) Monsanto quotes Judge Laird from what it states to be a later point in the same WBRC news story:
"I simply said that I expect you to negotiate in good faith and if I find that you are not making an attempt to even negotiate in good faith, then that is contempt and you may go to jail. But I never said that they would go to jail if they didn't settle this case."
(Petition at 28-29.) Monsanto quotes Judge Laird from a purported WCFT news story that it states aired on March 14, 2002:
"No, I never once told anybody that I would send them to jail if they did not settle this case. But I did tell them that I will use my contempt powers and possibly send someone to jail if they did not make a good-faith effort to comply with my order and try to work this case out." (Petition at 29.) Monsanto quotes a segment from a news package it states ran on WVTM-TV on March 26, 2002:
"Reporter: Now the short-term cleanup has already begun in Anniston. Right now Solutia is cleaning up property that has the highest levels of PCBs in the soil, but some residents say a lot more work still needs to be done. The judge says this new motion could jeopardize part of the cleanup process.
"Judge Laird: The defendants are asserting that I should just turn it over to [the United States Environmental Protection Agency] and not compete with EPA. So, really that's just something I have to weigh and look at all the caselaw and weigh what I should do or am required to do in this case."
(Petition at 30.) Monsanto also quotes from a news package it states aired on WCFT on March 28, 2002:
"Judge Laird: I have that motion under advisement at this time.
"Reporter: Even Judge Joel Laird has accused Solutia's lawyers of using underhanded tactics during the trial. He's refusing to let the EPA's decision affect this case.
"Judge Laird: I'm moving forward until someone tells me I need to stop, or until we finish this one."
(Petition at 30.)
Monsanto also quotes material from newspaper articles to support its claim that Judge Laird appears biased. In its "Petitioner's Notice of Filing of Ruling," Monsanto argues:
"The [Wall Street Journal] article concludes with Judge Laird's indication, which obviously took place during an ex parte media interview, that he was actually referring to petitioners in his remarks: `Was he really talking about Solutia, he [Judge Laird] is asked later. He nods yes.'"
(Petitioner's Notice at 5.) In its petition, Monsanto states that in an article that appeared in the St. Louis Post-Dispatch on March 15, 2002,[33] Judge Laird said: "I wish I had handled it differently. But *630 what's a frustrated father to do when he can't get an unruly teenager to cooperate?"[34] (Petition at 33.)
Monsanto argues that this case is directly analogous to other cases in which appellate courts have held that trial judges were required to recuse themselves because they appeared to be biased. Monsanto cites Microsoft, supra, In re Boston's Children First, 244 F.3d 164 (1st Cir.2001), and United States v. Cooley, 1 F.3d 985 (10th Cir.1993), as examples of cases in which other courts have ordered recusal under what it argues are circumstances similar to, or even less egregious than, the circumstances in this case.
The plaintiffs argue that even if this Court was to consider the substance of *631 Judge Laird's remarks, and not merely treat the remarks as unreliable hearsay, Judge Laird's public comments do not violate Alabama's Canons of Judicial Ethics. The plaintiffs argue that the Alabama Canons of Judicial Ethics, while discouraging commentary on the merits of a pending action, nevertheless permit a judge to make public comments that help the public understand the proceedings. "Canon 3 A(6) specifically states that it `does not prohibit judges ... from explaining for public information the procedures of the court.'" In re Sheffield, 465 So.2d at 355 (ellipses in original) (citations omitted). The Court in In re Sheffield, went on to say that
"[j]udges should encourage representatives of the news media [to] inquire of them for background information relating to the operation of the court system. While judges may not comment on the merits of a pending case, a judge may and should explain legal terms, and concepts, procedures, and the issues involved in that case so as to permit the news representatives to cover the case more intelligently.... Often there is no one other than the judge who is in a position to give a detailed and impartial explanation of the case to the news media."
In re Sheffield, 465 So.2d at 355 (quoting National Conference of State Trial Judges Committee on News Reporting and Fair Trial, Judicial Guidelines for Dealing with News Media Inquiries and Criticism (5th Draft, June 5, 1984)).
Judge Laird's remarks, considered in their totality, the plaintiffs argue, simply explain the proceedings in the case and do not raise, to an objective observer, questions of partiality. The plaintiffs question, for example, how any observer could see bias in the following comment by Judge Laird to a television reporter:
"The defendants are asserting that I should just turn it over to [the United States Environmental Protection Agency] and not compete with EPA. So, really that's just something I have to weigh and look at all the caselaw and weigh what I should do or am required to do in this case."
(State and ADEM's Brief at 19, quoting Petition at 30.) The plaintiffs argue that "[e]xplaining to the interested public that a motion made by the petitioners will receive careful analysis is hardly suggestive of a trial judge with a personal bias." (State and ADEM's Brief at 19.) The plaintiffs argue that all of the remarks Monsanto cites offer only explanation, and to the extent that any of the remarks offer judgment or opinion, Judge Laird's remarks are properly derived from what he has learned in the proceedings and do not address the merits of any pending or prospective issues.
We agree that even if the remarks attributed to Judge Laird by the press reflect what Judge Laird actually said, they either explained factual and procedural aspects of the case or were based on what Judge Laird had observed in court during the course of this litigation.[35] Other courts that have considered similar kinds of public remarks by trial judges have found no basis for recusal. "[R]emarks reflecting even strong views about a defendant will not call for a judge's recusal so long as those views are based on his *632 own observations during the performance of his judicial duties." United States v. Barry, 961 F.2d 260, 263 (D.C.Cir.1992)(holding that a judge's remarks that "he believ[ed] four jurors were determined to acquit Barry from the start and misled the court during jury selection about their objectivity," 961 F.2d at 262, did not require the judge to recuse himself from sentencing the defendant); United States v. Fortier, 242 F.3d 1224, 1229 (10th Cir.2001)(holding that the judge's comments to the press that "[w]e haven't sat down and re-evaluated the guidelines yet in view of the opinion. I suppose I could do a lot of things. I guess I don't know... That's a matter I haven't researched yet," did not require the judge to recuse himself from resentencing the defendant on remand from appeal); United States v. Yonkers Bd. of Educ., 946 F.2d 180, 184-85 (2d Cir.1991)(holding that the trial judge's comments in an interview did not require him to recuse himself because" he only restated what he had been saying in open court for the past few years and did not discuss the details of remedy implementation"); United States v. Haldeman, 559 F.2d 31, 34-36 (D.C.Cir.1976)(a judge's comments in a televised interview that he was confident that the defendants could get as fair a trial in the District of Columbia as anywhere in the United States did not prejudge any motion for a change of venue and require the judge's recusal; the comments, instead, fairly expressed the judge's confidence in the quality of the judiciary in Washington, D.C.); United States v. Bauer, 84 F.3d 1549, 1559-60 (9th Cir.1996)(a judge's comments in three newspaper articles indicating that he thought marijuana distribution to be a serious and pervasive social problem did not require him to recuse himself in a criminal prosecution for conspiracy to manufacture and distribute marijuana); State ex rel. Bardacke v. Welsh, 102 N.M. 592, 605-06, 698 P.2d 462, 475-76 (Ct.App.1985)(a judge's comments quoted in a newspaper that "there's a natural bias against a pro se pleading," and that "Welsh was simply taking too much of his time, forcing him to read cases that not only were meritless but `scandalous,'" did not require the judge to recuse himself); Roatch v. Puera, 534 N.W.2d 560, 563-64 (Minn.Ct.App.1995)(a judge's comments in a newspaper interview that a pending case might set a precedent did not require the judge to recuse himself from that case); State v. City of Breezy Point, 394 N.W.2d 592, 597 (Minn. Ct.App.1986)(a judge's comments in a newspaper interview, made after the issuance of an injunction and the award of attorney fees, but before the filing of posttrial motions, did not require recusal; the comments merely described the effect of the decision on the community and the judge's belief that no issues remained pending in the case); Commonwealth v. Travaglia, 541 Pa. 108, 143-44, 661 A.2d 352, 369-70 (1995)(a judge's numerous comments in newspaper interviews, including the comment that he was "shocked that it takes 11 years in our judicial system to find an excuse to avoid the death penalty" and that "[i]f anyone deserves to die, these two individuals (Appellant and Lesko) do for killing four people for fun," did not require the judge's recusal from a collateral proceeding attacking the defendant's conviction and sentence); Wayne County Prosecutor v. Parole Board, 210 Mich.App. 148, 154-55, 532 N.W.2d 899, 902 (1995)(a judge's comments to a television reporter that, "Once I was acquainted with the facts, the brutal nature of the crime, the amount of timehe had only served some five years for this horrible crimehis poor prison adjustment, plus the psychological reports, it seemed clear-cut to me that he should not be released early," though reflecting an erroneous perception of the relevant law, were sufficiently tied to the facts of the case so as not to warrant the judge's recusal); Oates v. *633 State, 619 So.2d 23, 25-26 (Fla.Dist.Ct. App.1993) (stating that while it would have been far better if the trial judge had not spoken to the press in the middle of a trial, the judge's comment in a newspaper interview that the defendant "was just being an obstinate jerk," did not warrant the judge's recusal because "[n]o reasonable person could conclude, on reading the transcript in this case, that this defendant was not being an obstinate jerk"); State v. Mincey, 141 Ariz. 425, 442-45, 687 P.2d 1180, 1197-1200 (1984)(a trial judge's comments to members of the media that the defendant had been sentenced twice before and that the judge was uncertain whether he could impose a different sentence, and that he felt the jury verdict could have gone either way, were not sufficient to demonstrate bias warranting the judge's recusal; instead, the remarks indicated that the judge was not biased and had not prejudged the case).
The cases Monsanto cites in support of its position are inapposite and distinguishable. Monsanto's citation to Microsoft is unpersuasive because the trial judge in Microsoft had conducted secret interviews with members of the press that were intended for publication at the conclusion of the trial; it was that conduct that created an appearance of bias. 253 F.3d at 115. Monsanto's citation to United States v. Cooley, 1 F.3d 985 (10th Cir.1993), is similarly unpersuasive. In Cooley, the United States Court of Appeals for the Tenth Circuit found that comments attributed to the trial judge that appeared in a number of newspaper articles did not constitute grounds for recusal. 1 F.3d at 995. The Tenth Circuit Court of Appeals held: "The judge's appearance on Nightline[[36]] is another matter, however." 1 F.3d at 995. Because the trial judge insisted on Nightline that he would see to it that his injunction was enforced, he "unavoidably created the appearance that [he] had become an active participant in bringing law and order to bear on the protestors, rather than remaining as a detached adjudicator." 1 F.3d at 995 (footnote omitted). On that basis, the court in Cooley held that the trial judge appeared biased and this appearance of bias warranted recusal. 1 F.3d at 995. Moreover, in Cooley, it is clear that the trial judge's remarks were wholly extrajudicial; the judge was commenting on events taking place on the streets of Wichita, Kansasnot on facts he had learned during the course of a trial. Nowhere does Monsanto offer facts in this case that indicate that Judge Laird has become an active participant on the plaintiffs' side of the case. Judge Laird's comments, if we were to accept the newspaper reports as accurately reflecting them, would indicate merely that Judge Laird will consider the issues, research the law, and issue rulings in accordance with the law.
Finally, Monsanto's citation to In re Boston's Children First, 244 F.3d 164 (1st Cir.2001), is similarly unpersuasive. In Boston's Children First, the judge wrote a letter to a newspaper explaining her decision in the case and making comments on the merits that "provided defendants with a ready-made argument with which to distinguish the instant case from Mack [v. Suffolk County, 191 F.R.D. 16 (2000)]." 244 F.3d at 167 (footnote omitted). The court in Boston's Children First found that recusal was warranted because the judge's comments did "more than correct[ ] [the plaintiff's] misrepresentations and creat[ed] an appearance of partiality." 244 F.3d at 171. The court held that it would have been perfectly acceptable for the trial judge to explain "the procedures of her court," or to correct factual misrepresentations. *634 244 F.3d at 170. Monsanto's petition in this case, however, is devoid of evidence indicating that Judge Laird has done anything in media interviews but repeat statements he has made on the record in court or describe the procedures being used in the litigation.
Because this Court concludes that Monsanto has failed to demonstrate a clear legal right to the relief it seeks, we deny its petition for the writ of mandamus requiring Judge Laird's recusal from this case.
PETITION DENIED.
HOUSTON, LYONS, BROWN, JOHNSTONE, HARWOOD, WOODALL, and STUART, JJ., concur.
MOORE, C.J., concurs in the result.
NOTES
[1] Pharmacia Corporation has been Monsanto's parent corporation since 2000.
[2] Solutia, Inc., spun off from Monsanto in 1997.
[3] The entire record is not before this Court. The parties state in their briefs that at the initial trial the claims of 17 plaintiffs were considered. In portions of the trial transcript submitted as exhibits in support of the mandamus petition, the parties sometimes refer to only 16 plaintiffs being participants in the first phase of the trial.
[4] The order reads in part:

"In an effort to encourage the parties in this case to reach a just and amicable resolution of the issues involved herein this Court has previously suggested that they voluntarily submit to settlement negotiations with one another. The parties having failed voluntarily to do so, this Court entered numerous orders and directives requiring the parties to mediate and attempt to negotiate a settlement of all, or any portion of, the issues on this case with no less than six (6) mediators or special masters involved. This Court finds that to this date all parties have failed to make a good faith attempt to comply with this Court's orders.
"The jury in this case having now returned a verdict in favor of the Plaintiffs and against the Defendants on the issues of liability, it is more important than ever, and the parties have more reason and incentive than ever, to reach a just resolution of the issues in this case. It is therefore ordered, adjudged and decreed that the following people shall appear on March 2, 2002 at 9:00 a.m. in the courtroom of the undersigned trial judge located in Calhoun County, Alabama for purpose of a settlement conference.
". . . .
"Each of the above individuals shall be present promptly at 9:00 a.m. and shall remain present and available until released or excused by this Court. The wilful failure to comply with this order shall result in sanctions for contempt of Court."
[5] The affidavit of David F. Snively, Monsanto's assistant general counsel, states that at 12:40 p.m., Monsanto told the court that it could not engage in settlement negotiations, under the threat of incarceration.
[6] This is the time shown on the time stamp on the fax transmittal of the motion received by this Court.
[7] Monsanto's Exhibit C offered in support of its petition purports to include the transcript of proceedings for March 12, 2002. Monsanto's submission, however, omits pages 6676-77 of the transcript, the pages of the record that contain the statement by Monsanto's attorney that describes the substance of this Court's stay order.

In argument before Judge Cardwell on the recusal motion, Donald Stewart, one of the plaintiffs' attorneys stated:
"Now, Judge, I was in that courtroom at that time, as were a number of other lawyers, and no one in that courtroom had any evidence whatsoever that the Supreme Court of the State of Alabama had entered an order staying all of the proceedings of this Court. Now, you've got to understand, Judge, that this proceeding has been stayed before by a petition of writ of mandamus for some 28 months. So this came as sort of a surprise to everyone there.
"Now that afternoon at 3:07 this lawyer got faxed from the Alabama Supreme Court this order right here. And this order, Judge, indicates, `It is ordered'it's in the second paragraph, `that all proceedings in this case in the Circuit Court of Calhoun County, Alabama, pertaining to a settlement conference and all proceedings pursuant to Rule 16 are stayed pending further orders of this Court.'
"Now, Judge, if you will recall, it was at 2:04 that we were informed by defendants' counsel that the Supreme Court of the State of Alabama had stayed all of the proceedings. Everybody left. Depositions that were taking place closed down.
". . . .
"So I assume, Judge, he was faxed, don't know, assume he was faxed his order about the same time I was from the Supreme Court, as they normally do these kinds of things."
(Transcript of the recusal hearing at 79-81.) Stewart went on to state:
"Judge, I'm going to provide you with a copy of the transcript of what happened on that date. You already have a copy of it. The reason I do that, Judgeon March 12. The reason I do that is in addition toand it'sIn addition to making the statements that I referred to previously in the petition where they indicated a different sequence of events about this stay order and what happened with the adjournment and the ruling, in this volume right here, which I'm sure the Court has got a copy of. A huge number of exhibits that they've attached, the defendants failedand I will state for the Court as an officer of the Court that that is what they didfailed to provide pages 76 and 77-6676 and 6677 of the transcript. And what appears on those two pages is just exactly what I was talking to you about earlier, Judge."
(Transcript of the recusal hearing at 86-87.)
Monsanto states in its application for a rehearing that transcript pages 6676 and 6677 "were inadvertently omitted from the copy of the transcript that was submitted to the trial court in support of the motion to recuse." Monsanto also states in its application for a rehearing that it had submitted transcript pages 6676 and 6677 to this Court in support of a petition for the writ of mandamus it filed in an earlier case, case no. 1011122. But see, however, Rule 21(a), Ala. R. App. P.
[8] Monsanto argues in its application for a rehearing in this case that our characterization of the events leading up to the adjournment of the settlement conference

"is incomplete and suggests that Petitioners intentionally misled the trial court with respect to the scope of a stay ordered that same day by this Court. The Court's opinion does not explain that Petitioners' counsel promptly informed the trial court of the actual language contained in this Court's stay order upon receipt of the written order.
"In fact, Petitioners' counsel, upon receipt of the actual order entered by this Court, immediately faxed a letter to Judge Laird and plaintiffs' counsel at approximately 3:20 p.m. stating:
"`The initial information I received about the scope of the Alabama Supreme Court's order was incorrect, for the court's information, enclosed is a copy of the order.'
"See Plaintiffs' Exhibit 15 (submitted at the August 8, 2002, hearing before Judge Cardwell)."
Monsanto attached as an exhibit in support of its application for a rehearing a copy of Plaintiffs' Exhibit 15, which is a copy of the fax transmittal from Monsanto to Donald Stewart, one of the plaintiffs' attorneys, notifying Stewart that on March 12, 2002, in open court, Monsanto had misstated information concerning this Court's order staying the case. Plaintiffs' Exhibit 15 was among the materials the plaintiffs submitted to the trial court in opposition to Monsanto's mandamus petition.
Monsanto also attached as an exhibit in support of its application for a rehearing a "message confirmation" that indicated that Monsanto's counsel transmitted three pages to Judge Laird at 3:21 p.m. on March 12, 2002. Because the "message confirmation" was not among those exhibits submitted to the trial court or to this Court by Monsanto in support of its mandamus petition, it was not and is not before this Court on mandamus review.
[9] The plaintiffs argue in their "Response to [Monsanto's] Supplemental Submission in Support of Petition for Writ of Mandamus" that "[Monsanto] here seek[s] to wrongfully attack Judge Laird in a litigation tactic to introduce even further delay in this lawsuit." (Plaintiff's Response at 1 n. 1). In Ex parte Crawford, 686 So.2d 196 (Ala.1996), this Court held that a party could seek review of a judge's decision not to recuse himself either by a direct appeal or by a petition for a writ of mandamus. In Crawford, this Court noted that "the use of the mandamus procedure would provide review of this interlocutory ruling before the parties have spent time and money to try a case presided over by a judge who should possibly have recused." 686 So.2d at 198. The magnitude and complexity of this case make Monsanto's decision to seek mandamus review of the ruling on its recusal motion appropriate. Monsanto properly moved the trial court for recusal. The trial court properly considered Monsanto's motion by hearing argument from both sides concerning the relevant law and facts. Dissatisfied with the trial court's answer, Monsanto timely petitioned this Court for a writ of mandamus. "`The remedy for mistakes of law or fact in individual cases is by appeal, or certiorari, or other proper proceeding.'" In re Sheffield, 465 So.2d 350, 357 (Ala.1984)(quoting In re: Judges of Municipal Court of Cedar Rapids, 256 Iowa 1135, 130 N.W.2d 553, 554 (1964)).

Indeed, Monsanto has no other proper means to seek a remedy on the trial court's recusal decision. "[T]he [Judicial Inquiry] Commission's advisory opinions are not binding and do not affect a party's rights or remedies." City of Dothan Personnel Bd., 831 So.2d at 6 (quoting Ex parte Balogun, 516 So.2d 606, 609 (Ala.1987)). Moreover,
"[t]o invoke the disciplinary power ... against a judge as a substitute for appellate review would establish a practice dangerous to the independence of the judiciary and equally dangerous to the public's constitutional right to an independent judiciary... [P]ermitting such a procedure could encourage individuals or groups of individuals to take action primarily for the purpose of intimidation."
In re Sheffield, 465 So.2d at 357-58 (quoting In re Troy, 364 Mass. 15, 306 N.E.2d 203, 217 (1973)).
[10] Monsanto argues in its petition that Judge Laird has made public comments about its case that violate Canon 3.A(6), Alabama Canons of Judicial Ethics, and that Judge Laird's public comments constitute grounds for recusal. Monsanto cites no authority, however, that suggests that a violation of Canon 3.A(6) itself constitutes a sufficient ground to compel recusal. "[C]ourts construing [Canon 3.A(6)] have held that a judge's public comment does not create a per se appearance of bias." United States v. Fortier, 242 F.3d 1224, 1229 (10th Cir.2001).

"But while the district judge's extrajudicial voicing of his views of the jury verdict may be a violation of the Code of Conduct for United States Judges, see Canon 3(A)(6)(1990)(`A judge should abstain from public comment about a pending or impending proceeding in any court ....'), any such violation does not necessarily create an appearance of personal bias or partiality such as to require recusal...."
In re Barry, 946 F.2d 913, 914 (D.C.Cir.1991). That Judge Laird may have made public comments about this case in violation of Canon 3.A(6) is not per se a sufficient ground for this Court to order his recusal. This Court must consider any remarks made by Judge Laird under Canon 3.C. for evidence of bias.
[11] The requirement that a judge recuse himself or herself under 28 U.S.C. § 455(a) parallels Canon 3.C(1), Alabama Canons of Judicial Ethics. Section 455(a) requires that "[a]ny justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." The Supreme Court of the United States has interpreted this section to mean that "what matters is not the reality of bias or prejudice but its appearance." Liteky v. United States, 510 U.S. 540, 548, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994). In deciding what constitutes an appearance of bias sufficient to compel recusal, that Court held:

"[O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge.... Not establishing bias or partiality... are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women ... sometimes display. A judge's ordinary efforts at courtroom administrationeven a stern and short-tempered judge's ordinary efforts at courtroom administrationremain immune."
510 U.S. at 555-56, 114 S.Ct. 1147.
[12] This Court must exercise particular caution or reluctance to order recusal where the grounds that give rise to recusal appear in media accounts about the judge or trial. "To find otherwise would allow an irresponsible, vindictive or self-interested press informant and/or an irresponsible, misinformed or careless reporter to control the choice of judge." In re United States 666 F.2d 690, 694 (1st Cir.1981)(footnote omitted). Moreover, "`to the extent the doubts [concerning the judge] were created by representatives of the press shown to be not grounded in fact, they cannot require disqualification.'" United States v. Greenough, 782 F.2d 1556, 1558-59 (11th Cir.1986)(quoting United States v. Alabama, 582 F.Supp. 1197, 1208 (N.D.Ala.1984)).
[13] Monsanto also alleges in its November 18, 2002, "Notice of Filing of Ruling" that "Judge Cardwell did not apply the correct standard for evaluating whether recusal is required." Monsanto complains:

"[Judge Cardwell's] order is based upon a finding that Petitioners did not demonstrate actual prejudice or bias on the part of the trial judge ... [when t]he applicable test for recusal `is not whether a judge is impartial in fact, but whether another person, knowing all of the circumstances, might reasonably question the judge's impartiality whether there is an appearance of impropriety."
Because this Court concludes that Judge Laird's conduct and remarks did not create an impermissible appearance of bias, we need not consider whether Judge Cardwell applied the wrong standard in his consideration of the motion for Judge Laird's recusal.
[14] Monsanto had suggested to Judge Laird that he conduct the settlement conference in Birmingham.
[15] Monsanto supports its contention that Judge Laird threatened contempt sanctions with affidavit testimony from eight Monsanto representatives who were present at the conference. There is no transcript from the morning session of the settlement conference.
[16] Monsanto also cites In re NLO, Inc., 5 F.3d 154, 157 (6th Cir.1993), and Strandell v. Jackson County, Ill., 838 F.2d 884, 887 (7th Cir. 1987), for the proposition that Rule 16, Fed. R. Civ. P., does not permit a judge to coerce a settlement. Rule 16, Fed.R.Civ.P., is analogous to Rule 16, Ala. R. Civ. P. In re NLO and Strandell both hold that a trial judge lacks authority under Rule 16, Fed.R.Civ.P., to compel participation in a nonbinding summary jury trial.
[17] Monsanto quotes Judge Laird as stating, "It's obvious that the Defendants have drawn a line and aren't concerned about settling this matter today...." (Petition at 23, quoting transcript at 6675.)
[18] Monsanto quotes Judge Laird's statement to the attorney:

"I've been considering what to do as far as any contempt is concerned, and I'm not going to bother to hold you in contempt. I don't know that sending you to the county jail would change any actions on your part in the future whatsoever. And I don't know that I want to go that far in punishing you for contempt of this Court. So I'm not going to do it. But I do want you to know that you and your law firm have lost every bit of credibility with this Court."
(Petition at 24, quoting transcript at 6837-38.)
[19] We do not reach that issue. The plaintiffs argue that Judge Laird operated well within his authority under Rule 16, Ala. R. Civ. P., because that rule "authorizes the imposition of sanctions `if a party or party's attorney fails to participate [in a pretrial settlement conference] in good faith.'" Guillory v. Domtar Indus. Inc., 95 F.3d 1320, 1334 (5th Cir.1996) (citations omitted); In re Novak, 932 F.2d 1397, 1405 (11th Cir.1991)("participants in pretrial settlement conferences must be prepared and authorized to negotiate and commit to settlement terms at that time ...; if these individuals ... actually are unprepared, Rule 16 authorizes the court to sanction them"). See also In re Atlantic Pipe Corp., 304 F.3d 135, 145 (1st Cir.2002)(holding that "it is within a district court's inherent power to order non-consensual mediation in those cases in which that step seems reasonably likely to serve the interests of justice"). The United States Court of Appeals for the First Circuit reasoned in Atlantic Pipe that the holdings in In re NLO, Inc., 5 F.3d 154, 157 (6th Cir.1993), and Strandell v. Jackson County, Ill., 838 F.2d 884, 887 (7th Cir.1987), that a trial court could not order a summary nonbinding jury trial under Rule 16, were inapposite in "complex cases involving multiple claims and parties." 304 F.3d at 145. The First Circuit Court of Appeals found: "The fair and expeditious resolution of [complex] cases often is helped along by creative solutionssolutions that simply are not available in the binary framework of traditional adversarial litigation." 304 F.3d at 145.
[20] The plaintiffs state:

"It should be noted that the comment [that Solutia and Monsanto lack concern for the environment] was delivered after a 6-week jury trial in which the defendants were found liable for, inter alia, wantonness, outrage, and suppression of the truth."
(State and ADEM's Brief at 13 n. 3.)
[21] The plaintiffs argued before Judge Cardwell that they believe Monsanto has taken out of context the examples it used to show Judge Laird's alleged bias:

"I think, Judge, if you are going to present in a proceeding like this, this motion that Mr. Starnes [Monsanto's counsel] says is a very serious motion, and you are complaining about the Court questioning your credibility, then you ought to give the Court that is making that proceeding a true recitation of the facts. And if you give them exhibits, you ought not to leave out those pages that contradict what that recitation of the facts in your pleadings are. And in 13 or 14 pages of that motion to recuse, they do just exactly what I said, if the Court carefully reads it."
In argument on other related issues, plaintiff's counsel makes the same point: "Judge, all the Court was doing in that caseand I'll provide you copies of the transcript so you have got a more complete copy, not just a snippet...." Plaintiff's counsel again makes the point, "The next issue, Judge, was a discovery dispute. You only got a part of that record. I'm going to give you transcript of the trial, 4204, those pages through 4211."
[22] The entire record is not before this Court in this mandamus proceeding. Monsanto has incorporated as exhibits in support of its petition a limited number of excerpts from the trial transcript. The plaintiffs also have provided this Court with transcript excerpts. Thus, the analysis of the context of Judge Laird's remarks is limited to the relatively few pages of transcript submitted by the parties to this Court.
[23] Because Monsanto did not include transcript page 5280 among the supporting exhibits, this Court does not have before it materials that might place Judge Laird's remarks in context.
[24] The transcript pages immediately following 5608 are not included among Monsanto's exhibits, but pages 5605 through 5607 are included.
[25] Monsanto included 26 newspaper articles as exhibits in its initial submission to this Court. It subsequently amended this submission to include an additional article.
[26] While Monsanto did not originally submit the Wall Street Journal articleElliot Spagat, "Solutia Is in Showdown with Local judge: Folksy Fan of `Andy Griffith Show' Sets his Mind to fight for Townspeople in PCB Case," Wall Street Journal, April 29, 2002as an exhibit in support of its recusal motion, it introduced the article in the hearing before Judge Cardwell on that motion.
[27] There is no similar rule for videotapes of television news broadcasts. Therefore, Monsanto's videotape exhibits lack a rule-based presumption of "authenticity."
[28] For example, the Wall Street Journal article includes the following statements that purport to describe Judge Laird's attitudes, beliefs, plans, and purposes: (1) "The case is in the hands of Calhoun County Circuit Court Judge Joel Laird, a rabid fan of `The Andy Griffith Show' who sometimes finds legal guidance in Andy's homespun approach." (2) "As the judge sees it, a settlement is necessary." (3) "Beyond monetary damages, Judge Laird is also mulling whether to order the chemical makers to clean up the town." (4) "But Judge Laird wants to move ahead on his own, citing plaintiffs' concerns that the EPA will be too soft." (5) "As Judge Laird sees it, Solutia and other defendants need to step it up." The Wall Street Journal paraphrases Judge Laird:" Judge Laird says he wasn't threatening jail for failure to settle, only insisting on a good faith effort." After describing Judge Laird's teaching of a Sunday school class, the Wall Street Journal article describes Judge Laird's nonverbal communication: "Was he really talking about Solutia, he is asked later. He nods yes."
[29] The television interviews, if properly authenticated, might not be hearsay if they were introduced for the limited purpose of proving that Judge Laird spoke with television reporters. "A statement made out of court is not hearsay if it is given in evidence for the purpose merely of proving that the statement was made, provided that purpose be otherwise relevant in the case at trial." Bryant v. Moss, 295 Ala. 339, 342, 329 So.2d 538, 541 (1976).
[30] The State/ADEM plaintiffs argue in their brief to this Court:

"One television excerpt submitted by the petitioners is not only explanatory [of judicial procedure], but clearly taken out of context.... The videotaped footage of this interview submitted by the petitioners, however, shows that the trial judge's response was cut off in mid-sentence. There is no way for this Court to know or presume what the judge may have said that was edited out of the interview."
(State and ADEM's Brief at 20.)
[31] Monsanto submitted the videotapes of the television news packages without any supporting affidavits attesting to when the news stories were broadcast or how the videotapes submitted as exhibits were created.
[32] The Microsoft court recognized that it would, in fact, "be extraordinary to disqualify a judge for bias or appearance of partiality when his remarks arguably reflected what he learned, or what he thought he learned, during the proceedings." 253 F.3d at 115.
[33] Monsanto's exhibit is actually a purported copy of the article from the newspaper's Web site.
[34] The St. Louis Post-Dispatch article Monsanto submitted as an exhibit states:

"Tom Bistline has been handling pollution cases for Monsanto Co. and its spinoff, Solutia, Inc. for more than a decade.
"`I've never seen a proceeding quite like what we went through on Tuesday' in Anniston, Ala., the lawyer said.
"Neither has the judge who started the ruckus. `I wish I had handled it differently,' said Judge Joel Laird, who briefly threatened to jail John Hunter, Solutia's chief executive. `But what's a frustrated father to do when he can't get an unruly teenager to cooperate?'
"....
"`It was tense,' Bistline said. `The judge asked our counsel who was the ultimate authority for Solutia, and he referred to John Hunter. Then, the judge said, "I'm going to incarcerate Mr. Hunter unless..."'
"Opinions differ about what came next. Solutia's lawyers say the judge demanded a settlement. Laird says he wanted only a `good-faith effort' to negotiate.
"`I guess I got my hopes up too high Tuesday,' Laird said via telephone Thursday. `I was disappointed very quickly.'
"Lawyers for the three companies quickly petitioned the Alabama Supreme Court for an injunction. And by 2 p.m., it granted an emergency stay of the settlement conference, and Laird allowed the executives to go home.
"`I had no intention of sending anyone to jail,' Laird said.
Bistline said Laird's statements and action in court `revealed to us that he had prejudged significant parts of the case that are yet to be resolved.'
"....
"`I'll go on treating both sides fairly in this case,' Laird said, `and will not waste any more efforts in trying to talk them into settling. I've learned my lesson.'"
Virginia Baldwin Gilbert, "Judge learns lesson in PCB talks gone awry," St. Louis Post-Dispatch, March 15, 2002.
The St. Louis Post-Dispatch article may well illustrate why a court should not rely on newspaper accounts as a basis for finding an appearance of bias sufficient to warrant recusal. The State and ADEM argue in their brief to this Court: "The comment attributed to the judge may or may not have been reported accurately. It may have been taken out of context; it may have been misquoted; or it may have been a fabrication by the reporter." (State and ADEM's Brief at 18.) The reporter who wrote the article was not in Judge Laird's Anniston courtroom for the settlement negotiation and is, therefore, unable to offer a firsthand, or even a secondhand, account of events. Without attribution to any witness, the reporter states that Judge Laird "started the ruckus." The reporter quotes Judge Laird as stating that he would have handled the matter differently, but the reporter does not state the question to which Judge Laird is responding when he makes that statement. The reporter also quotes Monsanto's attorney quoting Judge Laird threatening to jail a Solutia executive. The reporter paraphrases remarks made by Judge Laird about what he expected in settlement negotiations. Those aspects of journalistic stylequotation of answers without an indication of the question, quotation of secondhand sources without verification, paraphrasingmanifest the concerns that caused the courts in In re United States 666 F.2d 690, 694 (1st Cir.1981), and United States v. Greenough, 782 F.2d 1556, 1558-59 (11th Cir. 1986), to warn that newspaper accounts are not sufficiently reliable to serve as the basis for finding an appearance of bias so as to warrant a judge's recusal.
[35] Monsanto submits as exhibits in support of its petition a number of articles from which it does not quote directly. The remarks attributed to Judge Laird in those articles are consistently benign. For example, in a May 27, 2000, article that appeared in the Anniston Star, Judge Laird is purported to have said, "I'd rather err on the side of caution," in response to a question about how he would proceed on pending motions. The article stated that Judge Laird wanted to take his time and check the law before ruling on pending motions.
[36] Nightline is a news program where guests frequently are interviewed on "live" television as opposed to appearing in previously taped interview segments.